2019 PA Super 9

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ERIC L.L. LEANER | : | |
| | : | |
| Appellant | : | No. 471 EDA 2016 |

Appeal from the Judgment of Sentence April 4, 2014
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002556-2012

BEFORE: BENDER, P.J.E., BOWES, J., and STEVENS*, P.J.E.

OPINION BY STEVENS, P.J.E.:                     **FILED JANUARY 08, 2019**

Appellant, Eric L.L. Leaner, appeals *nunc pro tunc* from the April 4, 2014, judgment of sentence entered in the Court of Common Pleas of Philadelphia County following his conviction by a jury on the charges of second-degree murder, robbery, and possession of an instrument of crime.[1] Appellant presents eleven issues, and after a careful review, we affirm.

The relevant facts and procedural history are as follows: Appellant was arrested in connection with the murder of sixty-one-year-old Thomas McNeil, and, represented by counsel, he proceeded to a jury trial. At trial, Wallace Tabron testified he assisted Mr. McNeil in moving furniture for Mr. McNeil's aunt on September 14, 2009, and that evening, they stayed at the aunt's new house. N.T., 11/19/13, at 75-76. The following morning, at approximately

---

[1] 18 Pa.C.S.A. §§ 2502(b), 3701, and 907, respectively.

---

*   Former Justice specially assigned to the Superior Court.

6:15 a.m., as they traveled to the local U-Haul to return the truck, Mr. McNeil waved at two young men who were standing at the intersection of 32nd and York Streets. *Id.* at 77.

Mr. McNeil, who was driving the rental truck, pulled into a parking lot and exited the vehicle to speak to the two young men. *Id.* at 78. Mr. Tabron remained inside of the vehicle and, after a while, he looked into the vehicle's side mirror and observed Mr. McNeil lying on the ground with a man wearing a rust-colored hoodie or jacket "going through his pockets." *Id.* at 78-80. Mr. McNeil was on his back and not responding in any manner. *Id.* at 79. Mr. Tabron exited the truck and picked up a crowbar, which he discovered near the truck. *Id.* Mr. Tabron waved the crowbar at the young men, including the one going through Mr. McNeil's pockets, so that they would leave the area. *Id.*

One of the young men backed way, but the young man in the rust-colored hoodie/jacket started to approach Mr. Tabron. *Id.* However, both young men fled when a marked police vehicle "came down the street." *Id.* The police vehicle "started chasing" the young men while Mr. Tabron remained with Mr. McNeil. *Id.*

Mr. Tabron testified that Mr. McNeil was semi-conscious and, after ambulance personnel removed him from the ground, Mr. Tabron saw Mr. McNeil's wallet on the ground. *Id.* at 84. Mr. McNeil's identification and credit cards were still in the wallet; there was no cash in the wallet. *Id.* Mr. Tabron

indicated he cooperated with the police investigation and gave a statement to the police on September 15, 2009, at 7:20 a.m. *Id.* at 86. Mr. Tabron confirmed that he described the man going through Mr. McNeil's pockets as "[a] [b]lack male, 30s, 5-6, around 180 pounds, beard, dark complexion, low-cut hair, wearing a two-tone rust-colored jacket." *Id.*

Mr. Tabron testified Mr. McNeil died on January 17, 2010, and on January 18, 2010, at 6:30 p.m., he gave a second statement to the police. *Id.* at 87. In the second police statement, Mr. Tabron described the man who went through Mr. McNeil's pockets as wearing "an orange hoodie[.]" *Id.* at 89. Also, in the statement to the police, he indicated Mr. McNeil's wallet was "underneath him and it was empty. And his credit cards were all on the ground underneath him." *Id.*

Mr. Tabron confirmed that, on January 19, 2010, at 1:20 a.m., the police showed him a photo array and he chose Appellant's photo as "the guy who didn't run and came at me" when he picked up the crowbar. *Id.* at 93. Mr. Tabron indicated that, at trial, he was unable to identify whether Appellant was involved with the crime because he was losing his eyesight. *Id.* at 94.

Nishea Wilkerson testified she was a dancer "for tips" at a squatter house on Patton Street, and she knew Appellant by the nickname "Black." *Id.* at 139-40. She indicated her brother and Appellant "hung out" together. *Id.* at 142. Ms. Wilkerson gave the police a statement in which she indicated Appellant ran "stripper parties out of the house." *Id.* at 148.

At trial, Ms. Wilkerson confirmed she was "stripping" in the house on Patton Street during the night of September 14, 2009, into the morning of September 15, 2009, and Appellant was present in the house wearing an orange hoodie. *Id.* at 149-52. At trial, Ms. Wilkerson indicated "a couple guys" were at the party wearing orange hoodies; however, she admitted that in her statement to the police, as well as at Appellant's preliminary hearing, she testified Appellant was the only person wearing an orange hoodie at the party. *Id.* at 153-55.

Ms. Wilkerson testified that, when the party ended, she stayed in the house on Patton Street to sleep and, at around 6:15 a.m., she awoke to police officers pounding on the front door. *Id.* at 156. Ms. Wilkerson confirmed the police took her to the police station for questioning on September 15, 2009, and in her statement she told the police that an orange hoodie, which the police seized from the living room, belonged to her brother. *Id.* at 162. She testified at trial that she told the police the hoodie belonged to her brother, as opposed to Appellant, because her brother was a minor and she "thought he wouldn't get in trouble about anything." *Id.* at 163. She further confirmed that in her second statement to the police, which she made on January 19, 2010, she identified Appellant from a photo array and informed the police that he was wearing the orange hoodie on September 14-15, 2009. *Id.* at 170. In the second statement, she admitted to the police that she had lied in her first statement as to the owner of the orange hoodie. *Id.* at 171.

- 4 -

Police Officer Carlos Rodriguez testified he was responding to a radio call for an unrelated burglary in a marked cruiser on September 15, 2009, when, at 6:18 a.m., he observed three men standing on the corner in a vacant lot. N.T., 11/21/13, at 44-45. On direct examination, he testified as follows:

**Q.** When you observed the three individuals, what did you see, if anything, happen?

**A.** I see three individuals standing in a triangle type of way. I see the [victim], McNeil. He's like in the tip. If you can picture a triangle, he's at the top end. Then I see two black males on the two bottom end having a conversation. At first it was a glance that I seen. To me, the reason I noticed them because they fit the flash of a burglary that I was responding to at first.

**Q.** And specifically, what do you see then among the triangle as it progresses?

**A.** When I looked again to see the three individuals, I noticed an individual that was wearing an orange hoodie, dark-colored jeans strike the older gentleman, McNeil, in the head. And McNeil went down to the ground.

**Q.** When you say you saw a guy in the orange hoodie strike the older gentleman in the head what, if anything, did you see him strike him in the head with?

**A.** A crowbar.

**Q.** Now as you sit here in the court today, do you see the man who had the orange hoodie who held that crowbar?

**A.** Yes, the gentleman sitting right over there.

**[ADA]:** Indicating [Appellant].

**Q.** Now, at the time that you observed Mr. McNeil get hit in the head from where you are, did Mr. McNeil stay standing, or what did he do?

**A.** He drops to the ground.

**Q.** What's the next thing that happens that you see after Mr. McNeil drops to the ground?

**A.** I radioed in for more units. When I approached[,] when I started to approach the individuals and looked at them, actually. I seen a gentleman coming out of the truck who already had a

crowbar and was swishing away the two individuals, trying to keep them at bay while Mr. McNeil was laying on the ground.

At that point, I radioed in for more units and I was trying to decide how I was going to approach them by car, whether the side or to the middle, because it's two of them down there and only one of me. I decided to approach them head-on and jump on to the pavement. But by the time I reached them, [Appellant] and his colleague [saw] me—

**Id.** at 45-47.

Officer Rodriguez testified he made eye contact with Appellant, who was wearing an orange hoodie, and then Appellant and his apparent "friend" took off running. **Id.** at 48. Officer Rodriguez indicated Appellant ran towards and then past his cruiser, coming within three feet of him. **Id.** at 48-49.

Officer Rodriguez put the police cruiser in reverse and began following Appellant; he testified he chose to follow Appellant, as opposed to the other man, since Appellant "is the one that struck the [victim] McNeil in the head with a crowbar." **Id.** at 49-50. Officer Rodriguez, while radioing for assistance and keeping Appellant in sight, followed Appellant to a house on Patton Street and observed Appellant run into the house. **Id.** at 53. The officer stopped his vehicle in the middle of the street and tried to enter the house behind Appellant; however, the door had been locked. **Id.** at 54. The officer started knocking on the door and a back-up officer arrived. **Id.**

After several minutes of knocking, Ms. Wilkerson looked out of a window located over the door and asked what the officer needed. **Id.** at 54-55. He instructed her to open the door, and she complied. **Id.** at 55. However, by

the time the police gained entry into the house, Appellant was no longer in the house, although his discarded orange hoodie was lying on the floor in the dining room. *Id.* at 55-56. Officer Rodriguez specifically testified at trial that he recognized the orange hoodie as being the same hoodie that he saw Appellant wearing when he struck Mr. McNeil with the crowbar. *Id.* at 56. The officer confirmed there was a back door to the subject house on Patton Street. *Id.*

Officer Rodriguez clarified he saw Appellant strike Mr. McNeil one time with the crowbar and Mr. McNeil immediately dropped to the ground. *Id.* at 60. He also clarified that the crowbar, which he saw Mr. Tabron pick up, was the same crowbar, which had been in Appellant's possession. *Id.* He also specifically identified Appellant in court as the man he saw hit Mr. McNeil in the head with a crowbar. *Id.* at 85.

Detective Sekou Kinebrew testified he took a statement from Ms. Wilkerson on September 15, 2009, and she told him the orange hoodie belonged to her minor brother, James. *Id.* at 144.

Detective Harry Glenn testified he took a statement from Ms. Wilkerson on January 19, 2010. In this statement, Ms. Wilkerson admitted she lied to Detective Kinebrew when she told him the orange hoodie belonged to her brother, James. *Id.* at 162. She admitted the orange hoodie belonged to "Black," who Ms. Wilkerson knew "all [her] life." *Id.* She also confirmed to Detective Glenn that Appellant was known as "Black," he was wearing the

orange hoodie at a party on the night of September 14, 2009, to the early morning of September 15, 2009, and no one else at the party was wearing an orange hoodie. *Id.* at 161-63. Detective Glenn indicated Ms. Wilkerson identified Appellant from a photo array. *Id.* at 164.

The Commonwealth then introduced excerpts of preliminary hearing testimony given by Donta Wilkerson, who was unavailable, into evidence. At the preliminary hearing, Mr. Wilkerson denied knowing Appellant. *Id.* at 183. He admitted that he was in the vacant lot and saw the beating of Mr. McNeil; however, he denied knowing who committed the crime since the person was wearing "a hoodie." *Id.* at 183-84. At this point at the preliminary hearing, as read to the jury at trial, the Commonwealth confronted Mr. Wilkerson with his police statement in which he admitted the following (verbatim):

> Me and Black were walking along Douglas and York Streets toward Patton Street when two males approached us in a U-Haul truck. The male in the passenger seat asked us if we had any hard. I replied no, but Black answered yes. And asked him how many do you need. The male asked if he could get six for 50. Black told him yeah and then told him to pull into a lot on Douglas and York.
>
> The male got out of the truck and came around to the passenger side of the truck. Black acted as if he were going to serve him but instead tried to snatch the money out of his hand. Black told the man give me the money, OG. The male attempted to fight Black off.
>
> But Black struck the old man in the head twice with his hand. The male fell backward on the concrete and hit his head very hard. The male in the truck got out and tried to help the man that was on the ground. The other male [] got out of the truck and reached for a crowbar that was on the ground.
>
> Black told the male, I wish you would pick up that crowbar. The cop came down Natrona Street the wrong way and attempted

- 8 -

to stop me and Black. I ran towards 32nd Street. Black ran towards Cumberland and Douglas Street.

I ran into the alley on 32nd and Patton and hid there until everything was clear. When I came out the alleyway, I saw my friend. He was on his way to work, and asked him to drop me off at my grandmother's house. Then he gave me an address. I stayed at my grandmother's [house] until around 12:30 p.m., then I went back outside to meet back up with Black. I asked Black why did he hit the old head like that.

Black said that the old head tried to tee off on him. I told Black that the old head hit his head very hard on the ground. Black said yeah, but he was not trying to give that bread up. I told Black to tell me the next time he was going to do something like that.

Black replied my fault. I ran into my sister Nishea and she told me that the cops had come around to the house on Patton Street. Nishea told me the cops were going to be coming back. So I told her that I was going to be getting down from there. I went to catch the train out to the Northeast.

*Id.* at 187-89.

In the statement to the police, Mr. Wilkerson admitted Appellant, also known as "Black," was wearing an orange hoodie at the time of the incident. *Id.* at 192. He also clarified in the statement that "hard" refers to "crack" and Appellant took $60.00 from Mr. McNeil. *Id.* at 192-93. Further, during the statement, Mr. Wilkerson positively identified Appellant from a photograph. *Id.* at 200.

Detective James Pitts testified he interviewed Ms. Wilkerson's brother, Donta, on January 19, 2010. He confirmed Mr. Wilkerson made a statement to the police as set forth *supra*. N.T., 11/22/13, at 14-24.

Detective Phillip Nordo confirmed he interviewed Mr. Tabron on January 18, 2010. He indicated Mr. Tabron positively identified two men from a photo array. Specifically, he identified Appellant as the person who took a step towards Mr. Tabron when he picked up the crowbar; he identified Donta Wilkerson as the man who backed away when Mr. Tabron picked up the crowbar. *Id.* at 51-52.

Jermaine Graham testified he is friends with Donta Wilkerson and Appellant, who lived on Patton Street. N.T., 11/20/13, at 37-38. Mr. Graham denied being present during the robbery of Mr. McNeil on September 15, 2009; however, he admitted that in December of 2009 he was arrested for three other robberies. *Id.* at 39-40.

Mr. Graham testified that, on January 5, 2011, he was in the courthouse basement waiting to testify in an unrelated case when he saw Appellant. *Id.* at 40. He testified as follows regarding a conversation he had with Appellant at that time:

> **Q.** Now when you saw [Appellant], did you happen to have any conversation with [Appellant]?
> **A.** Yes.
>
>                      \*\*\*
>
> **Q.** Now, as you talked with [Appellant] that morning, can you tell us what he said to you, like tell us what that conversation was.
> **A.** I mean, the conversation was about everything, but he wanted to know, he thought that they may have brought me down there to testify on him.
> **Q.** Now, at that time, you hadn't been to Douglas and York Streets at the time of the incident, correct?

**A.** Right.

**Q.** And what did he ask, other than whether you were there to testify against him, or like what else did he say about why he was here?

**A.** He spoke on the situation. He said—

**Q.** What did he say about the situation?

**A.** He said he felt as though Donta didn't have a right to be doing what he was doing, being though as he was involved.

**Q.** Now, I got to ask you to break it down for me. You said Donta didn't have a right to do what he was doing. What do you mean?

**A.** As far as telling on him.

**Q.** So when he's talking to you, he's saying he doesn't think Donta should have told on him; is that correct?

**A.** Right.

**Q.** And why did he say Donta shouldn't have told on him?

**A.** Because Donta had something to do with it.

**Q.** What did [Appellant] say happened?

**A.** He said they was robbing him, and it was a scuffle. Donta was holding him. He told me he hit him in his head.

**Q.** Who hit him in his head?

**A.** [Appellant].

**Q.** Who did he hit in the head?

**A.** Whoever this person was.

*** 

**Q.** And then did [Appellant] say what object, if any, he used to hit the man?

**A.** A crowbar.

**Q.** Did he indicate to you where he hit the man with the crowbar?

**A.** In the head.

**Q.** Did he say what happened after he hit the man in the head with the crowbar?

**A.** He said he fell and he hit his head on the curb.

**Q.** Did he say what happened to the man?

**A.** After that?

- 11 -

**Q.** Yes.

**A.** During that night?

**Q.** What did he say happened to the man that he hit on the head with the crowbar?

**A.** He said he died later on.

**Q.** And, in fact, when he talked about Donta, did he say what role Donta was supposed to play?

**A.** Donta was holding him.

*Id.* at 40-42, 45-46.

Mr. Graham further testified that Appellant told him that his brother was supposed to kill Donta because Donta was talking about the crime. *Id.* at 47-48.

Detective James Pitts indicated that he located Donta Wilkerson, and he testified at Appellant's preliminary hearing. *Id.* at 119-20. Detective Pitts, as well as Detective Ron Aikin, testified that the police attempted to locate Mr. Wilkerson so that he could testify at Appellant's trial; however, the police had not been able to find him. *Id.* at 103-04, 120-21.

Gary Collins, M.D., the Deputy Chief Medical Examiner for Philadelphia, testified that his colleague, Dr. Blanchard, performed the post-mortem examination on the remains of Mr. McNeil, who died on January 17, 2010, at the Chapel Manor Nursing Home; however, Dr. Blanchard retired from the Medical Examiner's Office. *Id.* at 168-69. Dr. Collins noted that, pertaining to Mr. McNeil, he reviewed Dr. Blanchard's autopsy report and photographs taken during the autopsy, as well as medical records from Temple Hospital,

Bryn Mawr, the Chapel Manor Nursing Home, and Aria Health. *Id.* at 169-71. Based on the review of these items, he formed an independent opinion as to the cause and manner of Mr. McNeil's death. *Id.* at 171. Specifically, he opined Mr. McNeil's cause of death was "complications of blunt head trauma" and the manner of death was "homicide." *Id.* at 173.

In forming his opinion, Dr. Collins testified that, at Temple Hospital on September 15, 2009, Mr. McNeil "was diagnosed with having a subdural hematoma, which is an accumulation of blood on the surface of the brain beneath the skull, as well as skull fractures of the base of the skull and fractures of his nasal bones." *Id.* at 175-76. In order to treat his injury:

> [Surgeons] had to do a craniotomy to relieve the hematoma, the blood that was building up on his brain. So the skull is a fixed object and so is the brain.
>
> If you have accumulation of blood or any liquid that shouldn't be there, it's going to cause pressure on the brain which can cause death really quickly if you don't relieve the pressure. So they had to do emergency surgery to relieve the pressure of the hematoma and during that state, had to go back a few more times to help relieve additional pressure caused by the initial surgery from the initial assault.

*Id.* at 176.

Dr. Collins testified surgeons inserted a drain to constantly remove fluid accumulating on Mr. McNeil's brain, and he opined Mr. McNeil would have died soon after the beating had he not received immediate medical care. *Id.* at 175, 181.

Dr. Collins noted that after two months of care at Temple Hospital Mr. McNeil was discharged to the Chapel Manor Nursing Home. *Id.* at 176-77. Following the September 15, 2009, assault, Mr. McNeil had neurological deficits such that he could not sit, move, or speak; he was on a feeding tube; he was incontinent of urine and feces; and he could not care for himself in any manner. *Id.* at 177-78. He noted "[t]here was never any real improvement" in Mr. McNeil's condition after the assault. *Id.* at 182. Further, he testified that "with the lack of improvement, I can then correlate and say, well, there's no intervening factor between this assault and him getting better and his death. So the initial event had to have played a significant role in his overall conditioning to end his [life] four months later." *Id.* Dr. Collins testified the head injury sustained by Mr. McNeil caused him to be "neurologically devastated where [he couldn't] care for [himself]" and made him prone to infection, problems maintaining adequate nutrition, and a weakened immune system. *Id.* at 183-84. He testified the records demonstrated that Mr. McNeil "wasted away," meaning he lost weight and muscle, after the assault, and eventually, his heart stopped beating. *Id.* at 187-88, 211.

Dr. Collins noted the medical records revealed that, prior to the beating, Mr. McNeil had high blood pressure and lymphoma, which is cancer of the white blood cells; however, Mr. McNeil was in "functional physical health" and able to care for himself in all respects prior to the assault. *Id.* at 179.

At the conclusion of all testimony, the jury convicted Appellant of the offenses indicated *supra*, and following a hearing, on April 4, 2014, the trial court sentenced Appellant to life in prison for second-degree murder; five years to ten years in prison for robbery; and two and one-half years to five years in prison for possession of an instrument of crime; the sentences to run concurrently. Appellant did not initially file a direct appeal; however, after his direct appeal rights were reinstated on January 29, 2016, via a timely filed PCRA[2] petition, this counseled appeal followed on February 4, 2016. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, Appellant timely complied, and the trial court filed a responsive Pa.R.A.P. 1925(a) opinion.

On appeal, Appellant presents the following issues, which we have set forth verbatim:

1. Did the Trial Court err in denying the Appellant's motion under Rule 600, and denying his right to a speedy trial under the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution?

2. Was the evidence insufficient to support the verdict of Second Degree Murder, as the Commonwealth failed to establish causation?

3. Did the trial court err in allowing the admission of an autopsy report, which is testimonial, without the testimony of the purported expert who prepared said report, and did the trial court err and abuse its discretion in allowing admission of the testimony of an expert who did not participate in the autopsy of the decedent or prepare the autopsy report, and in failing to consider alternate means to admit relevant evidence, including

_____

[2] Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.

examining whether the expert who actually performed the autopsy was truly unavailable and whether it was possible to admit prior sworn testimony rather than having another expert who had no involvement in the autopsy give purported expert testimony, thus violating the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution? Further, was it error to deny the Appellant's mistrial motion arising from this issue?

4. Did the trial court err and abuse its discretion in denying the Appellant's objection and allowing Dr. Gary Collins, who acknowledged that he does not treat living individuals and that his expertise is solely in pathology and directed toward deceased individuals, to offer an opinion as to a hypothetical involving a living person as to how long that person might have survived without placement in a nursing care facility?

5. Did the trial court err in allowing the testimony and hearsay statements of Donta Wilkerson to be read into evidence, thereby violating the Appellant's confrontation rights under the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution?

6. Did the trial court err in allowing the Commonwealth to elicit testimony from a jailhouse informant about alleged threats to alleged co-conspirator Donta Wilkerson and in denying the Appellant's mistrial motion, for the reasons argued at N.T. November 20, 2013, pp. 22-25, 35, 47-48?

7. Did the trial court err and abuse its discretion in refusing to allow the [A]ppellant to cross-examine the detective who took Donta Wilkerson's statement as to allegations by named individuals that he (Detective James Pitts) and his partner (Detective Ohmarr Jenkins) used coercive and abusive techniques to obtain witness and/or suspect statements, thereby tending to support Donta Wilkerson's testimony that his statement was not accurate or voluntary, and did the trial court err and abuse its discretion further by denying the Appellant's mistrial motion?

8. Did the trial court err and abuse its discretion in denying the Appellant's motion for mistrial; *see* November 22, 2013, pp. 39-45?

9. Did the trial court err and abuse its discretion in denying the Appellant's motion to charge the jury as to Involuntary

Manslaughter, as there was evidence of record that could reasonably support such a verdict?

10. Did the trial court err and abuse its discretion in allowing another judge to preside over a portion of the Appellant's trial and make important decisions therein, thus violating his right to have a single judge preside over the entirety of that trial; *see* N.T. November 25, 2015; see also Pa.R.Crim.P. 601?

11. Is the Appellant's sentence illegal, as Robbery merges with Second Degree Murder for sentencing purposes? *See* N.T. April 4, 2013, pp. 12, 27.

Appellant's Brief at 5-6.

In his first issue, Appellant contends the trial court erred in denying his motion to dismiss for the Commonwealth's failure to bring the matter to trial in a speedy fashion as required by Rule 600 of the Pennsylvania Rules of Criminal Procedure.[3] Specifically, Appellant contends the trial court erred in holding the delay attributed to the trial court's crowded docket was "excludable time." He also contends the Commonwealth was responsible for some of the defense's requests for continuances such that the trial court erred in holding this delay was "excludable time." Appellant's Brief at 19.

We review Appellant's Rule 600 argument according to the following principles:

_____

[3] To the extent Appellant avers a violation of his federal and state constitutional right to a speedy trial, this issue is waived. Although Appellant suggested in his pre-trial motion that there was a violation of his constitutional rights, he abandoned the claim during the hearing/argument before the trial court. N.T., 11/21/13, 5-14. *See Commonwealth v. Colon*, 87 A.3d 352 (Pa.Super. 2014) (holding a constitutional claim of violation of speedy trial rights is separate from a Rule 600 issue).

In evaluating Rule [600] issues, our standard of review of a trial court's decision is whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

The proper scope of review is limited to the evidence on the record of the Rule [600] evidentiary hearing, and the findings of the [trial] court. An appellate court must view the facts in the light most favorable to the prevailing party.

Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule [600]. Rule [600] serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule [600] was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule [600] must be construed in a manner consistent with society's right to punish and deter crime. In considering [these] matters..., courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

***Commonwealth v. Armstrong***, 74 A.3d 228, 234–35 (Pa.Super. 2013)

(quotation omitted).

Rule 600 provides in pertinent part: "Trial in a court case in which a written complaint is filed against the defendant shall commence within 365

days from the date on which the complaint is filed." Pa.R.Crim.P. 600(A)(2)(a). The rule further states:

> (1) For purposes of paragraph (A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation.

Pa.R.Crim.P. 600(C)(1).

> To summarize, the courts of this Commonwealth employ three steps…in determining whether Rule 600 requires dismissal of charges against a defendant. First, Rule 600(A) provides the mechanical run date. Second, we determine whether any excludable time exists pursuant to Rule 600(C). We add the amount of excludable time, if any, to the mechanical run date to arrive at an adjusted run date.
>
> If the trial takes place after the adjusted run date, we apply the due diligence analysis set forth in Rule 600([D]). As we have explained, Rule 600[] encompasses a wide variety of circumstances under which a period of delay was outside the control of the Commonwealth and not the result of the Commonwealth's lack of diligence. Any such period of delay results in an extension of the run date. Addition of any Rule 600[] extensions to the adjusted run date produces the final Rule 600 run date. If the Commonwealth does not bring the defendant to trial on or before the final run date, the trial court must dismiss the charges.
>
> Due diligence is a fact-specific concept that must be determined on a case-by-case basis. Due diligence does not require perfect vigilance and punctilious care, but rather a showing by the Commonwealth that a reasonable effort has been put forth.

*Armstrong*, 71 A.3d at 236 (quotation marks and quotations omitted).

Here, in rejecting Appellant's Rule 600 claim, the trial court relevantly indicated the following:

Pursuant to the record, [Appellant] was arrested on January 21, 2010, and the criminal complaint was filed on January 22, 2010. Accordingly, the mechanical run date was January 21, 2011. The [trial] court calculated the excludable time as 1063 days based on the following: January 27, 2010 to February 23, 2010 (27 days attributable to the court), April 6, 2010 to June 9, 2010 (64 days attributable to the court), October 13, 2010 to March 8, 2011 (146 days attributable to the defense), April 6, 2011 to December 20, 2011 (258 days attributable to the defense), January 3, 2012 to February 28, 2012 (56 days attributable to the court), March 20, 2012 to April 11, 2012 (22 days attributable to the defense), April 19, 2012 to November 29, 2012 (224 days attributable to the defense), and February 25, 2013 to November 18, 2013 (266 days ruled excludable by the scheduling court in giving the first and only trial date). Adding 1063 days of excludable time to [the] mechanical run date produces an adjusted run date of December 19, 2013. Trial commenced on November 18, 2013, which was within the adjusted run date, and thus, [Appellant's] assertion of a violation of Pa.R.Crim.P. 600 is without merit.

Trial Court Opinion, filed 12/15/16, at 6.

We find no abuse of discretion in this regard. *See Armstrong*, *supra*. We specifically note that, with regard to the judicial delay in this case, it is well-settled that "judicial delay can support the grant of an extension of the Rule 600 run date." *Commonwealth v. Trippett*, 932 A.2d 188, 197 (Pa.Super. 2007) (citations omitted). This is particularly true where, as here, there is no indication the trial court did not schedule the criminal proceedings at the earliest possible date consistent with the court's business. *See id.* Further, to the extent Appellant suggests the Commonwealth may be held accountable for delay caused by the defense's requests for continuance, our jurisprudence has held the opposite. *See Commonwealth v. Watson*, 140

A.3d 696 (Pa.Super. 2016).  Thus, we find Appellant is not entitled to relief on his first claim.

In his second issue, Appellant contends the evidence was insufficient to sustain his conviction for second-degree murder.[4]  Specifically, he avers the Commonwealth failed to prove he caused the death of Mr. McNeil as is required for criminal homicide.  In this vein, Appellant highlights the following facts: (1) Mr. McNeil passed away 124 days after the incident, and (2) Mr. McNeil had pre-existing medical conditions, including cancer and coronary artery blockages.[5]  Appellant reasons that, when viewed in the light most favorable to the Commonwealth, "there were too many substantial intervening factors present to reach the conclusion that [Mr. McNeil's] head wound, debilitating though it was, played a direct and substantial causative role in his death." Appellant's Brief at 30.

Our standard of review is well-settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying the above test, we may not weigh the evidence and substitute

---

[4] Appellant has not challenged the sufficiency of the evidence as to his convictions for robbery and possession of an instrument of crime.

[5] Appellant also contends Mr. McNeil was a patient in several hospitals such that poor medical care could have been a substantial factor in causing his death.  However, there was no evidence presented at trial in support of this speculative assertion.  Accordingly, Appellant is not entitled to relief.

> our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Graham*, 81 A.3d 137, 142 (Pa.Super. 2013) (quotation marks and quotation omitted).

The Crimes Code defines murder of the second degree as follows:

**(b) Murder of the second degree.**—A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

18 Pa.C.S. § 2502(b).

Appellant's claim of insufficiency is a challenge to causation. To establish criminal causation, "the Commonwealth must prove that the defendant's conduct was so directly and substantially linked to the actual result as to give rise to the imposition of criminal liability." *Commonwealth v. Long*, 624 A.2d 200, 203–204 (Pa.Super. 1993) (citing *Commonwealth v. Rementer*, 598 A.2d 1300, 1304 (Pa.Super. 1991)) (citation omitted).

In ***Rementer***, we set forth a two-part test for determining criminal causation. First, the defendant's conduct must be an antecedent, but for which the result in question would not have occurred. ***Rementer***, [***supra***]; 18 Pa.C.S.A. § 303(a)(1). A victim's death cannot be entirely attributable to other factors; rather, there must exist a "causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place." ***Rementer***, 598 A.2d at 1305, n.3 (quotation omitted). Second, the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible. ***Rementer***, 598 A.2d at 1305.

As to the first part of the test, the defendant's conduct need not be the only cause of the victim's death in order to establish a causal connection. ***Rementer***, 598 A.2d at 1305. "Criminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result." ***Long***, 624 A.2d at 203[.] The second part of the test is satisfied when the victim's death is the natural or foreseeable consequence of the defendant's actions. "Where the fatal result was an unnatural or obscure consequence of the defendant's actions, justice would prevent us from allowing the result to have an impact upon a finding of the defendant's guilt."

***Commonwealth v. Nunn***, 947 A.2d 756, 760 (Pa.Super. 2008) (citations and quotations omitted).

In the case *sub judice*, there is no dispute Mr. McNeil suffered from medical problems prior to the assault, and his death occurred 124 days from the date of the assault. While Mr. McNeil's prior medical problems were predominantly chronic, Dr. Collins' testimony established that Mr. McNeil suffered skull fractures, fractures to his nasal bones, and a subdural hematoma (accumulation of blood on the surface of the brain beneath the skull) when he was hit with the crowbar. Further, Dr. Collins specifically

opined that Mr. McNeil's cause of death was complications from this blunt head trauma. As the trial court aptly indicated in its opinion:

> The testimony of medical examiner Dr. Collins portrayed the gravity of the injuries that [Appellant] inflicted upon [Mr.] McNeil by striking him in the head with a crowbar, whereupon [Mr.] McNeil's skull was essentially crushed. Dr. Collins described the irreparable damage caused to [Mr.] McNeil documenting the subdural hematoma, the fracture to the base of the s[k]ull, and the fracture to the nasal bone, and stated that such devastating injuries were consistent with the blunt force trauma caused by a hard metal object, such as a crowbar. Moreover, Dr. Collins testified that such injuries were consistent with [Mr. McNeil] being rendered unconscious upon impact and his testimony further explained the connection between the brain and the rest of the body and how brain injury affects other bodily systems. Specifically, he testified that [Mr.] McNeil's head injury caused significant bodily deficits from which [Mr.] McNeil never recovered, including [Mr.] McNeil's inability to sit, walk, or care for himself. This reduced bodily movement resulted in muscle atrophy throughout his body and Dr. Collins further explained that such lack of movement allows fluid to build up in the lungs, causing reduced levels of oxygen in the body, and ultimately causing other organs to suffer and leading to death.

Trial Court Opinion, filed 12/15/16, at 8-9 (emphasis omitted).

Viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, we conclude the evidence provides ample support for the jury's conclusion that Appellant's assault upon Mr. McNeil caused his death. Specifically, the evidence established a causal connection between Appellant's conduct (hitting Mr. McNeil in the head with a crowbar) and the result of his conduct (the death of Mr. McNeil). **See Nunn**, **supra**. Further, the fact medical intervention kept Mr. McNeil alive for 124 days after the assault does not suggest Appellant's action were so extraordinarily remote or attenuated

that it would be unfair to hold him criminally responsible for Mr. McNeil's death, particularly since Mr. McNeil's death was a natural or foreseeable consequence of Appellant striking him in the head with a crowbar. ***See id.*** Thus, we find no merit to Appellant's sufficiency claim.

In his third issue, Appellant argues the admission of an autopsy report, which was prepared by Dr. Blanchard, a non-testifying witness, violated his rights under the Confrontation Clause of the Sixth Amendment. He further argues Dr. Collins' expert opinions based on the autopsy report violated his confrontation rights since Dr. Collins did not perform the autopsy or prepare the report. Whether Appellant's confrontation rights were violated is a question of law; therefore, or standard of review is *de novo*, and our scope of review is plenary. ***Commonwealth v. Brown***, --- A.3d ---, 2018 WL 2452643, *5 (Pa. filed June 1, 2018) (citation omitted).[6]

---

[6] In ***Brown***, ***supra***, our Supreme Court recently considered whether an autopsy report—presented without accompanying testimony by the author—is testimonial in nature such that a defendant's Sixth Amendment right to confront the witnesses against him is violated by the admission of the autopsy report at trial. Noting that "Pennsylvania law requires the preparation of autopsy reports in all cases of sudden, violent and suspicious deaths, or deaths by other than natural causes, and in such cases, the autopsy and subsequent report are designed to determine whether the death occurred as a result of a criminal act[,]" ***id.*** at *9, the Supreme Court concluded that "the primary purpose for preparation of an autopsy report under these circumstances is to establish or prove past events potentially relevant to a later criminal prosecution and that any person creating the report would reasonably believe it would be available for use at a later criminal trial." ***Id.*** Thus, the Supreme Court held that the autopsy report in ***Brown*** was testimonial in nature and, therefore, "the report could properly be introduced into evidence without [the

Initially, with regard to the admission of the autopsy report, we conclude

Appellant has waived his claim. For instance, during the direct examination

of Dr. Collins, the Commonwealth, without objection, requested that the trial

court mark the autopsy report for identification purposes, and it was marked

C-40. N.T., 11/20/13, at 171. Further, at the close of the Commonwealth's

case-in-chief, the following relevant exchange occurred:

> **[ADA]:** Your Honor, with that, [the] Commonwealth would ask, first of all, for the exhibits to be entered into evidence which were marked and utilized throughout the trial.
>
> **THE COURT:** Those exhibits, those ones that have been marked and moved into evidence are now moved into evidence. They are in evidence.
>
> [Defense counsel], were there particular exhibits that were under objection? They were some that were just marked for identification, I think.
>
> **[DEFENSE COUNSEL]:** Your Honor, may we speak briefly at sidebar[?]
>
> **THE COURT:** You know what. All right. What we're doing now is making sure the issue we have the number of exhibits that were actually utilized and which ones we're saying are being allowed into evidence. We'll come back and put those number for you.
>
> (Sidebar discussion off the record.)
>
> **THE COURT:** All right. [ADA], you may continue.

_____

author's] accompanying testimony only if [the author] was unavailable and [the defendant] had a prior opportunity to cross-examine him." ***Id.*** (quotation marks and quotation omitted). Since the defendant in ***Brown*** had no prior opportunity to cross-examine the author of the autopsy report, the Supreme Court held the admission of the autopsy report into evidence at trial was error. ***Id.*** However, the Supreme Court further found that the error was harmless since "the erroneously admitted autopsy report was merely cumulative of [a testifying expert forensic pathologist's] independent opinion regarding the cause of death which was properly admissible." ***Id.*** at *10.

- 26 -

**[ADA]:** Your Honor, continuing, the Commonwealth would ask to mark and enter into evidence the exhibits referenced throughout the trial, which, I believe go from Commonwealth's Exhibit 1 to Commonwealth's Exhibit, I believe it's up to 51. And those that were relevantly marked and discussed.

**THE COURT:** All right. Those are marked and they are moved in. And we will, I believe we're going to show the jury some.

**[ADA]:** Yes, Your Honor, following that, the Commonwealth would ask for publication that is actually handing to the jury, Commonwealth's Exhibit C-1 through 15, the items that Officer Rodriguez actually drew on.

**THE COURT:** So C-1 through C-15. Just make sure [defense counsel] sees.

**[ADA]:** Also 16.

**THE COURT:** C-1 through 16 of what's going to be shown to the jury. So you are going to actually physically see these photographs. C-1 through 15, my staff will hand those around to you. Take the time you need to look through them.

N.T., 11/22/13, at 60-62.

As the record reveals, Appellant did not object to the admission of the autopsy report, and, thus, he has waived his claim of error.[7] **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised

_____

[7] Appellant contends the trial court erred in its Rule 1925(a) opinion when it suggested that Appellant waived his challenge to the introduction of the autopsy report. **See** Appellant's Brief 36 n.12. In support of his contention, he cites to pages 157-60 of the notes of trial testimony from November 20, 2013. However, our review of the cited pages reveals that, while Appellant objected to Dr. Collins testifying instead of Dr. Blanchard, and specifically "ma[d]e a motion for mistrial allowing Dr. Collins to testify[,]" Appellant did not object to the introduction of the autopsy report. N.T., 11/20/13, at 157-60.

for the first time on appeal."); **Commonwealth v. Rivera**, 603 Pa. 340, 983 A.2d 1211, 1229 (2009) (holding lack of contemporaneous objection results in waiver of issue on appeal).[8]

This does not end our inquiry, however, as Appellant has preserved his claim that the trial court violated his Confrontation Clause rights when it permitted Dr. Collins to offer expert opinions based on the autopsy report. Appellant argues that, in essence, the trial court permitted Dr. Collins to serve as an improper substitute for Dr. Blanchard, and, therefore, the trial court erred in denying his request for a mistrial.[9]

The record reveals that Dr. Collins was accepted at trial as an expert forensic pathologist upon stipulation of the parties and following *voir dire* of his qualifications before the jury. The jury was informed that Dr. Collins, the Philadelphia Deputy Chief Medical Examiner, had performed approximately 1500 autopsies, but he did not perform the autopsy of Mr. McNeil in the instant matter. N.T., 11/20/13, at 167. However, the jury was informed that Dr.

_____

[8] Even if not waived, as will be more thoroughly explained *infra*, to the extent the trial court erred in admitting the autopsy report, we conclude the error was harmless as it was merely cumulative of Dr. Collins' independent opinion regarding the cause of death, which was properly admissible. **See Brown**, **supra**.

[9] Appellant properly raised an objection to Dr. Collins' testimony in this regard at trial and made "a motion for mistrial allowing Dr. Collins to testify." N.T., 11/20/13, at 157-59. The trial court overruled Appellant's objection and denied the request for a mistrial. **See id.**

Collins had reviewed the autopsy photographs of Mr. McNeil and the autopsy report prepared by Dr. Blanchard, as well as various hospital/medical records pertaining to Mr. McNeil.

Based upon his review of these documents, the Commonwealth asked Dr. Collins to render his own opinion as to the cause and manner of Mr. McNeil's death, and Dr. Collins testified that, in his opinion, the cause of Mr. McNeil's death was "complications of blunt head trauma" and the manner of death was "homicide." *Id.* at 173. The Commonwealth argued at trial, as well as on appeal, that this testimony was admissible and did not violate the Confrontation Clause as Dr. Collins proffered his own independent expert conclusions regarding the cause and manner of death. The trial court agreed with the Commonwealth, and therefore, denied Appellant's request for a mistrial. We find no error in this regard. *See Commonwealth v. Jaynes*, 135 A.3d 606, 615 (Pa.Super. 2015) (setting forth standard of review for the denial of a motion for mistrial).

In **Brown**, **supra**, our Supreme Court was asked to determine whether an expert forensic pathologist, who had no role in the autopsy of the victim other than his review of the autopsy photographs and autopsy report prepared by a non-testifying witness, was permitted to testify that, in his opinion, "four gunshot wounds caused the victim's death[.]" **Brown**, 2018 WL 2452643, at *10. In holding the expert's opinion was admissible, and there was no

Confrontation Clause violation, our Supreme Court relevantly indicated the

following:

> We recognize that in ***Bullcoming*** [***v. New Mexico***, 564 U.S. 647, 131 S.Ct. 2705 (2011)], the High Court unquestionably held the right to confrontation is violated when the analyst who writes a report is not made available for cross-examination even if the report is wholly reliable. The testimony of a surrogate analyst is insufficient to vindicate the right to confrontation in such circumstances because cross-examination of the surrogate cannot expose any lapses or infirmities in the testing process or protocol employed by the analyst who authored the report. Significantly, for purposes of our present analysis, the ***Bullcoming*** Court noted no argument was presented in that case that the surrogate analyst had "any 'independent opinion' concerning Bullcoming's BAC." Here, [the expert forensic pathologist] testified his opinion four gunshot wounds caused the victim's death was his own independent opinion.
>
> Additionally, unlike ***Bullcoming***, this is not a case where a surrogate witness simply read a testimonial report authored by another into the record. In addition to the autopsy report, [the expert forensic pathologist] also examined autopsy photographs to support his own independent opinion as to the cause of death. Brown concedes the photographs were admissible evidence upon which [the expert forensic pathologist] could properly rely to inform his opinion. There is no Confrontation Clause concern over the opinions [the expert forensic pathologist] expressed based on his own review of the autopsy photographs because the photos were not testimonial statements of an unavailable witness. Thus, [the expert forensic pathologist], a medical examiner with many years' experience, reached an independent opinion regarding the cause of death in part by examining data other than [the non-testifying witness's] autopsy report.
>
> ***
>
> [W]e determine the factual scenario here differs from the factual scenario present in ***Bullcoming*** where the substitute analyst who testified at trial had no independent opinion regarding the defendant's BAC. Here [the expert forensic pathologist] formed an independent conclusion and testified to that conclusion based on his own review of both the otherwise inadmissible facts and data contained in the report and the data provided by the autopsy photographs. Because [the expert forensic pathologist]

properly formed an independent opinion, and was available to be cross-examined regarding the basis of that opinion, we conclude there was no Confrontation Clause violation with respect to his opinion regarding the cause of death.

*Brown*, 2018 WL 2452643, at *10-12 (footnote and citations omitted).

We conclude the factual scenario here is similar to that presented in *Brown*. Specifically, in the case *sub judice*, Dr. Collins did not act as a surrogate witness simply reading a testimonial report authored by another into the record. Rather, he testified that based on his examination of the autopsy report, autopsy photographs, and hospital/medical records, it was his own independent opinion that the cause of Mr. McNeil's death was "complications of blunt head trauma" and the manner of death was "homicide." N.T., 11/20/13, at 171-73. The record reveals these were his own conclusions and he was not "merely parroting" Dr. Blanchard's conclusions as set forth in the autopsy report. *See id.* Further, Dr. Collins was available to be cross-examined regarding the basis of his opinions, and therefore, we conclude there was no Confrontation Clause violation with respect to his opinion regarding the cause and manner of Mr. McNeil's death. *See Brown*, *supra*. Accordingly, we conclude Appellant is not entitled to relief on this claim.

In his fourth issue, Appellant contends the trial court erred in permitting Dr. Collins to offer an opinion on re-direct examination regarding a hypothetical question posed by the Commonwealth related to whether Mr. McNeil would have died sooner had he not received full-time care in a nursing

home. Appellant contends Dr. Collins' expert opinion improperly exceeded the appropriate scope of his specialized knowledge on the subject under investigation in that he was an expert in pathology stemming from his work with deceased individuals as opposed to a medical doctor who treats living patients. Appellant's Brief at 41.

At trial, on the re-direct examination of Dr. Collins, the following relevant exchange occurred:

> **[ADA]:** Hypothetically, instead of releasing Mr. McNeil to a nursing home providing 100 percent care for him with feeding tubes with catheters with moving his body, there are things they had to do for him. If Temple Hospital put him out on the street that day, would he have been able to survive?
>
> **[DEFENSE COUNSEL]:** I'm going to object, Your Honor.
>
> **THE COURT:** Can you give an opinion to that, Dr. Collins?
>
> **THE WITNESS:** Yes, I can, Your Honor.
>
> **THE COURT:** You may answer it. And set forth reasons how you're answering it.
>
> **THE WITNESS:** Let's say he was sent home. He probably would not have survived as long. He would have probably developed depending, on how good his family was, may have developed bed sores, may have looked a lot more wasted. I wouldn't have been surprised if he would have died a lot sooner.

N.T., 11/20/13, at 224-25.

Questions concerning the admissibility of evidence are within "the sound discretion of the trial court and its discretion will not be reversed absent a clear abuse of discretion." *Commonwealth v. Thompson*, 106 A.3d 742, 754 (Pa.Super. 2014). "Additionally, the trial court has discretion on the scope of re-direct examination." *Commonwealth v. Fransen*, 42 A.3d 1100, 1117

(Pa.Super. 2012) (*en banc*) (citation omitted). "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Pa.R.E. 703. Our courts have established that an expert may respond to a hypothetical with an opinion so long as the operative set of facts is eventually supported by competent evidence. ***Commonwealth v. Montalvo***, 604 Pa. 386, 986 A.2d 84, 95 (2009). "The expert's opinion is properly admissible to illuminate obscure and obtuse areas of knowledge. The hypothetical question should be employed to facilitate this end, focusing the witness' expertise onto the narrow issue under consideration." ***Ranieli v. Mutual Life Ins. Co. of America***, 413 A.2d 396, 398 (Pa.Super. 1979).

Here, in explaining the reasons it permitted the hypothetical to be asked during the re-direct examination of Dr. Collins, the trial court indicated the following:

> At trial, Dr. Collins, as an expert in forensic pathology, testified that he had reviewed [Mr.] McNeil's hospital and nursing home records and had formed his own opinion as to the manner and cause of [Mr.] McNeil's death. In presenting the basis of his opinion that [Mr.] McNeil's death was caused by complications of blunt force trauma, Dr. Collins gave testimony regarding [Mr.] McNeil's brain contusion and the documented procedures performed to reduce fluid build-up in his brain that had resulted from a subdural hematoma. His testimony explained the connection between the brain and the rest of the body and how brain injury affects other bodily systems. Specifically, he testified that [Mr.] McNeil's head injury caused a significant bodily deficit, including [Mr.] McNeil's inability to sit, walk, or care for himself. This reduced bodily movement resulted in muscle atrophy throughout his body and Dr. Collins further explained that such lack of movement allows fluid to build up in the lungs, causing reduced levels of oxygen in the body, and ultimately causing other organs to suffer and leading to death.

In order to focus Dr. Collins' expertise on the issue of determining the cause of [Mr.] McNeil's death, the prosecutor presented the [] hypothetical [indicated *supra*]….The hypothetical added no additional facts, but simply allowed the medical examiner to give an expert opinion as to how the extensive medical care sustained [Mr.] McNeil's life beyond what it would have been without such care, given the serious injuries inflicted and the subsequent deterioration of his bodily function as documented in the medical records. As such, the hypothetical permitted Dr. Collins to properly focus his testimony on the bodily circumstances causing [Mr.] McNeil's death without the life extending measures afforded by modern medicine and long term medical care.

Trial Court Opinion, filed 12/15/16, at 20-21 (footnotes omitted). We find no abuse of discretion in this regard. **Thompson**, **supra**.

Further, we note that, during cross-examination, defense counsel asked Dr. Collins questions relating to whether the care Mr. McNeil received at the nursing home may have caused his ultimate demise. N.T., 11/20/13, 203-09. In this vein, defense counsel "opened the door" for the line of questioning contained in the hypothetical on re-direct examination. Accordingly, the trial court did not abuse its discretion in permitting re-direct on the issue in order to dispel defense counsel's inferences. **See Commonwealth v. Smith**, 609 Pa. 605, 17 A.3d 873 (2011) (holding if defense counsel opens the door to a line of questioning on cross-examination the trial court may permit the Commonwealth to continue the line of questioning on re-direct examination).

In his fifth issue, Appellant contends the trial court erred in permitting the preliminary hearing testimony of Donta Wilkerson to be read into evidence at Appellant's trial, thus violating Appellant's confrontation rights.

Specifically, Appellant avers the Commonwealth failed to prove Mr. Wilkerson was unavailable for trial. He further contends that he did not have a full and fair opportunity to cross-examine Mr. Wilkerson at the preliminary hearing. As indicated *supra*, whether Appellant's confrontation rights were violated is a question of law, thus our standard of review is *de novo* and our scope of review is plenary. **See Brown**, **supra**.

"It is well-established…that the introduction of an unavailable witness's prior recorded testimony from a preliminary hearing is admissible at trial and will not offend the right of confrontation, provided the defendant had counsel and a full opportunity to cross-examine that witness at the hearing." **Commonwealth v. McCrae**, 574 Pa. 594, 832 A.2d 1026, 1035 (2003). Under the Pennsylvania Rules of Evidence, a witness is deemed unavailable if attendance at trial cannot be procured through reasonable means. Pa.R.E. 804(a)(5)(A).

With regard to the "full opportunity to cross-examine the witness at the prior proceeding," our Supreme Court has held that, "[w]hether prior testimony was given at trial or at any other proceeding where, as here, admission of that prior testimony is being sought as substantive evidence against the accused, we conclude that the standard to be applied is that of *full and fair opportunity* to cross-examine." **Commonwealth v. Bazemore**, 531 Pa. 582, 614 A.2d 684, 687 (1992) (emphasis in original). Where a defendant asserts that he did not have a full and fair opportunity to cross-examine the

witness at the preliminary hearing, he must establish that he was deprived of "vital impeachment evidence" at or before the time of the preliminary hearing. *Commonwealth v. Leak*, 22 A.3d 1036, 1044-45 (Pa.Super. 2011). "The Commonwealth may not be deprived of its ability to present inculpatory evidence at trial merely because the defendant, despite having the opportunity to do so, did not cross-examine the witness at the preliminary hearing as extensively as he might have done at trial." *Id.* at 1045 (quotation omitted).

Here, in rejecting Appellant's claim that his confrontation rights were violated by the introduction of Mr. Wilkerson's preliminary hearing testimony, the trial court relevantly indicated the following:

> Detectives Akin and Pitts provided th[e] [trial] [c]ourt with testimony regarding the Commonwealth's efforts to locate [Mr.] Wilkerson. Prior to the preliminary hearing, Detective Pitts went to [] S. Frazier Street—the only address he had for [Mr.] Wilkerson—and spoke with [Mr.] Wilkerson's sister-Nishea Wilkerson, who said she had not seen him. The detective left his card with contact information at the address. Detective Pitts next called a woman he believed to be [Mr.] Wilkerson's girlfriend, who told the detective that "she wasn't dealing with [Mr. Wilkerson]" and did not have any information on his whereabouts. Detective Pitts called the phone number [Mr.] Wilkerson had provided, which did not work. The detective searched for addresses for other members of [Mr.] Wilkerson's family and the only address that ever came back was the [] S. Frazier Street address. Despite these seemingly failed attempts, [Mr.] Wilkerson called Detective Pitts the morning of the preliminary hearing and told him he would be there and [Mr.] Wilkerson did appear for the hearing.
>
> In preparation for trial, Detective Aiken and Pitts went back to the [] S. Frazier Street address approximately a month and a half before trial and spoke with Nishea Wilkerson, who said she had not seen [her brother]. The detectives left a subpoena at the address for [Mr.] Wilkerson. The detectives returned to the house

on November 18, 2013[,] and November 19, 2013[,] and, again, spoke with Nishea Wilkerson[,] who still had not seen [Mr. Wilkerson].   The detectives contacted the morgue and area hospitals and did custody checks in both Pennsylvania and New Jersey and did not find [Mr.] Wilkerson's name.   The detectives checked the DMV and the only address returned for [Mr.] Wilkerson was the [] S. Frazier Street address.   The detectives checked the address provided by [Mr.] Wilkerson at the time of his interview with the Homicide Unit in 2009 and further checked the addresses contained within his criminal record[.]  [A]gain, the only address returned for [Mr.] Wilkerson was the [] S. Frazier Street address.   The detectives also checked the Clear database and received no additional address information.

On November 20, 2013, upon th[e] [trial] [c]ourt's request, detectives went out to recheck [] S. Frazier Street along with three other addresses of possible family members.   Detective Centino provided th[e] [trial] [c]ourt with testimony on the results of the search.   The detective stated that one address had a tenant who had been renting since 2011 and did not know [Mr.] Wilkerson; the second had no response at the door; and at the third address, which was the suspected address of [Mr.] Wilkerson's grandmother per information in [Mr.] Wilkerson's statement to police, detectives spoke with [Mr. Wilkerson's] uncle who had not seen him since the summer and indicated that [Mr. Wilkerson] had never lived at that address.   Additionally, detectives went to [Mr.] Wilkerson's last place of employment, per information in [Mr.] Wilkerson's statement to police.   Upon arrival at the address, which was reported to be a crisis center, the detectives instead found a church.   Further, Detective Centino confirmed that [Mr.] Wilkerson had not received any welfare benefits and that his driver's license was most recently validated in August, just three months earlier, at the [] S. Frazier Street address.   In evaluating the detectives' collective testimony, th[e] [trial] [c]ourt found the measures taken by the Commonwealth to be a reasonable…effort to locate [Mr.] Wilkerson and taken in conjunction with [Mr.] Graham's earlier testimony regarding the alleged threats to [Mr.] Wilkerson's life, [which were made by Appellant], th[e] [trial] [c]ourt determined that [Mr.] Wilkerson was unavailable.

Having found [Mr.] Wilkerson to be unavailable, th[e] [trial] [c]ourt next assessed whether [Appellant] had a full and fair opportunity to cross-examine [Mr.] Wilkerson at the preliminary hearing.   [Appellant] had the opportunity to inquire as to what [Mr.] Wilkerson saw the night of the incident, the identity of the

person involved in the incident, and the circumstances surrounding his statement to [the] police. Throughout the cross-examination, [Appellant] procured testimony that was inconsistent with the information provided in [Mr.] Wilkerson's signed statement to police. Based upon the testimony from the preliminary hearing, [the trial court] found that [Appellant] was represented by counsel and had a full and fair opportunity to test [Mr.] Wilkerson's credibility as a witness; thus, [the trial court] permitted [Mr.] Wilkerson's preliminary hearing testimony to be read at trial.

Trial Court Opinion, filed 12/15/16, at 13-16 (footnotes omitted).

The record supports the trial court's ruling, and we find no error.[10] **See** **Bazemore**, **supra**; Pa.R.E. 804(a)(5)(A).

In his sixth issue, Appellant contends the trial court erred in permitting a jailhouse informant, Jermaine Graham, to testify about alleged death threats Appellant made regarding Donta Wilkerson. Specifically, Appellant contends Mr. Graham's testimony (that Appellant told him that Appellant's brother was supposed to kill Donta because Donta was talking about the crime) constituted evidence of other bad acts. He alleges that, since the Commonwealth failed to provide reasonable notice of its intent to introduce Mr. Graham's testimony, the trial court should have excluded the testimony under Pa.R.E. 404(b)(3).

_____

[10] To the extent Appellant suggests he did not have a "full and fair opportunity" to cross-examine Donta Wilkerson at the preliminary hearing because the Commonwealth did not provide Appellant with Jermaine Graham's police statement, which was given one month after the preliminary hearing, we note Mr. Graham's statement implicated Appellant in the assault. Appellant has not explained how Mr. Graham's statement constituted "vital impeachment evidence" or, in fact, how it would have assisted him at the preliminary hearing. **Leak**, **supra**.

Further, Appellant contends the trial court erred in denying his motion for a mistrial based on Mr. Graham's testimony as the evidence of prior bad acts was "absurdly prejudicial." Appellant's Brief at 51.

We review a trial court's decision to admit or deny evidence for abuse of discretion or error of law. *Commonwealth v. Lopez*, 57 A.3d 74, 81 (Pa.Super. 2012). "Thus our standard of review is very narrow. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Id.*

Rule 404(b) of the Pennsylvania Rules of Evidence permits admission of prior bad acts evidence in certain circumstances. Rule 404(b)(3) requires the Commonwealth to provide the defense reasonable notice of its intent to introduce such evidence. Specifically, the Rule relevantly provides:

> In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. 404(b)(3). "The purpose of this rule is to prevent unfair surprise, and to give the defendant reasonable time to prepare an objection to, or ready a rebuttal for, such evidence. However, there is no requirement that the 'notice' must be formally given or be in writing in order for the evidence to be admissible." *Commonwealth v. Lynch*, 57 A.3d 120, 125–26 (Pa.Super. 2012) (citations and quotation marks omitted). The Supreme Court has held that sufficient notice exists where the prior bad acts evidence was discussed during a preliminary hearing or where the defense received the evidence in

discovery. ***Commonwealth v. Stallworth***, 566 Pa. 349, 781 A.2d 110, 118 n.2 (2001).

Here, during the trial, defense counsel indicated that the Commonwealth provided Mr. Graham's statement to him on October 31, 2013, approximately three weeks prior to trial. N.T., 11/20/13, at 26. Defense counsel admitted that he reviewed Mr. Graham's statement with Appellant prior to trial. ***Id.*** at 26-28. Without evidence of unfair surprise, the trial court ruled the Commonwealth did not violate Pa.R.E. 404(b)(3)'s reasonable notice requirement. We find no abuse of discretion in this regard.[11] ***Lopez***, ***supra***.

With regard to Appellant's claim that he was entitled to a mistrial because Mr. Graham's testimony was unfairly prejudicial, we note:

> In criminal trials, declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial. By nullifying the tainted process of the former trial and allowing a new trial to convene, declaration of a mistrial serves not only the defendant's interest but, equally important, the public's interest in fair trials designed to end in just judgments. Accordingly, the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In

---

[11] At trial, Appellant contended the Commonwealth should be excluded from offering Mr. Graham's testimony about Appellant's alleged plot to have Donta Wilkerson killed. However, as it pertains to a violation of Rule 404(b)(3), defense counsel did not argue "unfair surprise." Rather, he argued that, as a matter of law, in order to offer evidence of other bad acts, the Commonwealth was required to "file[] a motion under 404B under the Rules of Evidence which the Commonwealth [did not do] in this case." N.T., 11/20/13, at 23. As indicated *supra*, "there is no requirement that the 'notice' must be formally given or be in writing in order for the evidence to be admissible." ***Lynch***, 57 A.3d at 125-26.

- 40 -

making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so,...assess the degree of any resulting prejudice. Our review of the resulting order is constrained to determining whether the court abused its discretion. Judicial discretion requires action in conformity with [the] law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

*Jaynes*, 135 A.3d at 615 (quotations and citation omitted).

The trial court's decision to admit evidence is subject to review for an abuse of discretion. *Commonwealth v. Dengler*, 586 Pa. 54, 890 A.2d 372, 379 (2005). Here, as the trial court held, the bad acts evidence at issue was probative of Appellant's consciousness of guilt. Trial Court Opinion, filed 12/15/16, at 10 (citing *Commonwealth v. Flamer*, 53 A.3d 82 (Pa.Super. 2012, and *Commonwealth v. King*, 689 A.2d 918 (Pa.Super. 1997)). However, such evidence may be admitted "only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

In balancing whether the probative value of the evidence outweighed its prejudicial effect, the trial court relevantly noted that, in addition to being probative of Appellant's guilt, Mr. Graham's testimony regarding Appellant's desire to have Donta Wilkerson killed was illustrative of Mr. Wilkerson's unavailability as a witness at trial. Trial Court Opinion, filed 12/15/16, at 11-12. Further, Mr. Graham's testimony was not cumulative of other evidence presented at trial. *See id.* Thus, the trial court held the probative value of the evidence outweighed its prejudicial effect. *See id.*

- 41 -

We find no abuse of discretion in this regard. *See Dengler*, *supra*. As our Supreme Court has held, "[t]he trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration[.]" *Commonwealth v. Hairston*, 624 Pa. 143, 84 A.3d 657, 666 (2014) (quotation marks and quotation omitted). Although evidence of Appellant's plan to have Donta Wilkerson killed may have been prejudicial, it was not unduly so. *See id.* As the comment to Rule 403 instructs, "'[u]nfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403 cmt. "As with motive, the Commonwealth must be given the opportunity to show the strength of the defendant's consciousness of guilt through all admissible evidence. The highly probative nature of this evidence clearly outweighs any undue prejudice arising from its admission." *Flamer*, 53 A.3d at 88. Thus, since the bad acts evidence at issue was introduced for a legitimate purpose, and was not so prejudicial that it likely diverted the jury's attention away from its duty of weighing the evidence impartially, we conclude the trial court did not abuse its discretion in denying Appellant's motion for a mistrial. *See Jaynes*, *supra*.

In his seventh issue, Appellant contends the trial court abused its discretion in limiting his cross-examination of Detectives James Pitts, to whom Donta Wilkerson gave his pre-trial police statement. Specifically, Appellant contends the trial court erred in preventing him from cross-examining the

detective with a *Philadelphia Enquirer* news article, which reported allegations made against the detective, as well as his partner, Detective Jenkins, pertaining to the use of coercive and abusive techniques to obtain witness statements. We find this issue to be waived.

Here, at trial, the trial court *sua sponte* brought up the issue regarding the newspaper article. Specifically, the trial court indicated that it wanted to make defense counsel aware of the newspaper article so that he would have an opportunity to determine whether it should be used for cross-examination purposes. N.T., 11/20/13, at 149. Defense counsel indicated that he had heard about and "skimmed" the article. *Id.* at 150. Defense counsel indicated that, if Mr. Wilkerson's preliminary hearing notes were read into evidence, "Detective Pitts on the stand…may raise [issues] with regard to objections against Detective Pitts." *Id.* at 155. The trial court indicated that it would give the defense an opportunity to develop a position on the issue but that at that point it just wanted to bring the article to everyone's attention. *Id.* In response, the prosecutor noted that, "given the serious nature of what the Court is raising as a possible thing for the defense to raise," she needed to speak to her supervisor. *Id.* The trial court indicated that it was not ruling on anything but was giving the parties time to determine their positions. *Id.* at 156.

Later that same day, near the conclusion of the proceedings, defense counsel indicated that, as it pertained to possible cross-examination of Detectives Pitts and Jenkins, should they decide to testify:

I don't know if there is any kind of Internal Affairs investigation going on, headquarters investigation going on, ethics accountability investigation going on. These would probably be issues that might have to be investigated before Detective Pitts or Detective Jenkins can be cross-examined. I don't know what the Commonwealth's position---

*Id.* at 243-44.

The trial court noted that the court had no further information, and defense counsel asked for time to "wrap [his] head around it." *Id.* at 244. Defense counsel thanked the trial court for its "indulgence." *Id.* at 246. In response, the prosecutor noted that her position was that the newspaper article was not an appropriate area of cross-examination as it was based on speculation and unsubstantiated allegations. *Id.* at 247. In response, defense counsel indicated the newspaper article was "only one part of the inquiry[,]" and the other inquiry is whether there are formal investigations pending against the detectives. *Id.* at 248. The trial court noted that the court did not "believe you would be able to cross-examine those detectives with what other people said they did or didn't do. So if that's all it is, well, it's just other people who are unhappy with how they were treated by those detectives during a homicide investigation." *Id.* at 250. In any event, the trial court indicated that defense counsel could investigate the matter and, if an *in camera* hearing was need, the trial court would hold one. *Id.* at 250-51.

- 44 -

The next day, the trial court asked the prosecutor and defense counsel if they had an "opportunity to flesh out [any] objection" regarding Detectives Pitts and Jenkins. N.T., 11/21/13, at 15. Defense counsel indicated he "checked around" and the detectives had no open federal lawsuits pending against them, although there were "numerous Internal Affairs complaints that have been made against Detective Pitts." *Id.* at 16. Defense counsel indicated "I don't know if this Court wants to bring this case to a halt so that a subpoena can be issued to Internal Affairs to allow for that information to be reviewed in camera." *Id.* The trial court agreed to an in camera hearing to determine whether it was "just a newspaper report." *Id.* at 34-35.

At the conclusion of the in camera hearing, the trial court indicated that the newspaper article contained nothing more than an attorney's beliefs about a case involving his client, as well as "reports of people being contacted and unhappy about things[.]" *Id.* at 35. The trial court noted there was no information that "would create proper impeachment for either Detective Pitts or Detective Jenkins[.]" *Id.* at 36. The trial court indicated it would not "continue the case so that we can determine whether there's any validity because of something in the newspaper because it's a fishing expedition." *Id.* at 36. The trial court indicated that, based on the newspaper article itself, "there certainly isn't enough to allow any kind of cross-examination or impeachment of the detectives based on the newspaper article." *Id.*

In response, defense counsel indicated the following:

        With all due respect, I have to disagree with the Court about
the fishing expedition, the IAD file. The information that I have is
that allegations of misconduct have been made against Detective
Pitts. I have not seen any of those complaints nor have any of
those complaints have [*sic*] been made by any specific individual
that I am aware of.

        I have been advised by [an attorney] the IAD complaints
were made against Detective Pitts. He is aware of complaints
against him. So I don't think it's a fishing expedition.

        I understand the Court's position that you don't want to stop
a jury trial in progress for IAD files to be produced, but I think this
is more than a fishing expedition, under the circumstances.

        I respectfully submit the Court is going to allow Detective
Pitts to testify. I can certainly agree with the Court. Questioning
someone about a newspaper article which can certainly contain
anything and may be based upon complete speculation or
conjecture or can't be pursued because the person who is getting
the report to write the article is probably not proper. I think there
may be more here. The defense is going to be deprived of an
opportunity to investigate that, pursue those avenues.

*Id.* at 38-39.

Based on the aforementioned, we conclude that, although defense

counsel sought additional time to pursue whether there was any merit to the

allegations in the newspaper article, which the trial court denied, defense

counsel agreed with the trial court that it would be improper to cross-examine

Detective Pitts based on an unsubstantiated newspaper report of "complete

speculation or conjecture[.]" *Id.* at 39. Thus, to the extent defense counsel

now complains the trial court should have permitted him to cross-examine

Detective Pitts with regard to the newspaper article, without corroborating

information, we find the issue to be waived. *See* Pa.R.A.P. 302(a) ("Issues

not raised in the lower court are waived and cannot be raised for the first time

on appeal."); ***Rivera***, ***supra*** (holding lack of contemporaneous objection results in waiver of issue on appeal).

In any event, even if not waived, we note that the scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion. ***Commonwealth v. Hitcho***, 633 Pa. 51, 123 A.3d 731, 769 (2015). When a trial court determines the scope of cross-examination, it may consider whether the matter is collateral, the cross-examination would be likely to confuse or mislead the jury, and the cross-examination would waste time. ***Commonwealth v. Brinton***, 418 A.2d 734, 736 (Pa.Super. 1980). Here, the trial court suggested that the use of an unsubstantiated, speculative newspaper article for impeachment purposes would confuse or mislead the jury. In this regard, we find no abuse of discretion. ***See Hitcho***, ***supra***.

In his eighth issue, Appellant contends the trial court erred in denying his motion for a mistrial with regard to testimony offered by Detective Phillip Nordo during direct examination. Specifically, Appellant contends the trial court erred in permitting Detective Nordo to testify that Jarrett Washington, who did not testify, provided information to the police, which then led the police to put together a photo array, which included Appellant's photo, from which Mr. Tabron identified Appellant. Appellant contends Detective Nordo's testimony presented "hearsay testimony through a back door." Appellant's Brief at 57.

- 47 -

"Hearsay is an out of court statement offered to prove the truth of the matter asserted." ***Commonwealth v. Manivannan***, 2018 WL 2076100, *5 (Pa.Super. filed 5/4/18) (citation omitted). Pa.R.E. 801 defines "statement" as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Pa.R.E. 801(a).

The following portion of Detective Nordo's direct examination is relevant:

> **Q.** Detective Nordo, on January 18 of 2010, at 10:45 p.m., did you have occasion to speak to a man named Jarrett Washington, in this case named Street?
>
> **A.** Yes
>
> **Q.** Now, subsequent to that, were two photo arrays prepared?
>
> Yes.
>
> ***
>
> **Q.** Now, Detective, taking a look at, beginning with Commonwealth's Exhibit C-21, one of the photo arrays you have in front of you?
>
> **A.** Yes.
>
> **Q.** And can you tell us on what date and what time that photo array was prepared based on the stamping in the bottom right-hand corner?
>
> **A.** It's stamped 1/18/2010 at 11:42 p.m.
>
> **Q.** Yes. Turning to Commonwealth's Exhibit C-22, can you tell us on what date and time that was prepared?
>
> **A.** Stamp appears 1/18/2010 11:55 p.m.
>
> **Q.** Now following the preparation of those two photo arrays, did you have occasion then to speak with Mr. Tabron again?
>
> **A.** Yes.
>
> **Q.** Specifically, what time did you speak to Mr. Tabron again?
>
> **A.** It was early morning hours. As a matter of fact it's recorded here, 1:20 a.m.

**Q.** As you showed those photo arrays that were marked as C-21 and C-22 as you showed the photo array, did you ask Mr. Tabron questions about the photo arrays?

**A.** Yes.

\*\*\*

**Q.** And as you showed Mr. Tabron this photo array, did you record down what you asked him and what his response was?

**A.** It was recorded, yes.

\*\*\*

**Q.** And specifically what did he say in his statement?

**A.** I wanted to do my best to read this writing, this handwriting here from the detective. Yes, that's the guy who did run and come at me. Then it has here, "The witness positively identified Eric," the defendant.

N.T., 11/22/13, at 48-50.[12]

In rejecting Appellant's claim, the trial court indicated the following:

Based upon th[e] [trial court's] instructions to both the witness and the district attorney, the questioning of Detective Nordo was extremely tailored and did not go beyond the scope of the detective merely indicating that he had spoken with [Mr.] Washington. The direct examination of the detective was void of any inquiry as to the content of the interaction with [Mr.] Washington and, as such, the detective's testimony was free of any hearsay statements. The testimony was properly permitted to explain the course of the detective's investigation, which culminated in the preparation of photo arrays that were shown to the eyewitness, Wallace Tabron, who positively identified [Appellant]. Accordingly, the introduction of such testimony did not deprive [Appellant] of a fair and impartial trial[, thus the trial court] properly denied [Appellant's] motion for a mistrial.

_____

[12] In anticipation of Detective Nordo's testimony, Appellant lodged an objection and requested a mistrial. N.T. 11/22/13, at 39-45.

Trial Court Opinion, filed 12/15/16, at 23-24. We find no abuse of discretion in this regard. **See Jaynes**, **supra**. Specifically, as the trial court determined, Detective Nordo did not testify as to any "oral assertion, written assertion, or nonverbal conduct" of Jarrett Washington. Pa.R.E. 801.

In his ninth issue, Appellant contends the trial court erred in denying his request to charge the jury on involuntary manslaughter since there was evidence of record that could reasonably support such a verdict.[13] In this vein, Appellants points to Donta Wilkerson's police statement.

"[O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." **Commonwealth v. Yale**, 150 A.3d 979, 983 (Pa.Super. 2016) (citation omitted). An "[involuntary] manslaughter charge shall be given only when requested, where the offense has been made an issue in the case, and the trial evidence reasonably would support such a verdict." **Commonwealth v. Patton**, 936 A.2d 1170, 1177 (Pa.Super. 2007) (citations omitted). "A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner...he causes the death

---

[13] Appellant preserved this claim in the trial court. N.T., 11/22/13, at 65-84.

of another person." 18 Pa.C.S.A. § 2504(a).[14]   Where the evidence does not support the inference that the death was the result of reckless or grossly negligent behavior attributable to Appellant, an involuntary manslaughter instruction is unwarranted.  **See Commonwealth v. Smith**, 511 Pa. 343, 513 A.2d 1371, 1377–78 (1986).

Here, contrary to Appellant's assertion, Donta Wilkerson's police statement does not support the contention that Mr. McNeil's death was a result of Appellant's grossly negligent or reckless actions.  Instead, viewing Donta Wilkerson's statement in the light most favorable to Appellant, Donta informed the police that Appellant "acted as if" he was going to engage in a drug deal; however, instead, Appellant "tried to snatch the money out of [Mr. McNeil's] hand."  N.T., 11/21/13, at 187-89.  Donta indicated that Appellant told Mr. McNeil to "give me the money" and, when he would not do so, Appellant struck the "old man in the head twice with his hand[,]" resulting in Mr. McNeil hitting his head hard on the concrete.  Donta further indicated that, after the incident, Appellant told him he hit the victim because "he was not trying to give that

---

[14] In context of the Crimes Code, "reckless" conduct is the conscious disregard of a substantial and unjustifiable risk that the material element of the offense will result from the conduct. 18 Pa.C.S.A. § 302(b)(3).  A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct.  18 Pa.C.S.A. § 302(b)(4).

bread up." *Id.* Donta confirmed Appellant took money from Mr. McNeil. *Id.* at 192-93.

We agree with the trial court that Donta Wilkerson's statement, even when viewed in the light most favorable to Appellant, reveals that Appellant robbed the victim and, during the robbery, he struck the unarmed victim twice in the face, resulting in the victim falling and hitting his head on the concrete. Such evidence does not support the inference that Mr. McNeil's death was the result of reckless or grossly negligent behavior attributable to Appellant, and thus the trial court did not err in denying Appellant's request for an involuntary manslaughter instruction.[15] *See Commonwealth v. Williams*, 490 Pa. 187, 415 A.2d 403 (1980) (holding the appellant was not entitled to an involuntary manslaughter instruction where there was no evidence that the killing resulted from an accident or negligence; but rather, all evidence reasonably pointed to the appellant striking the victim in the head with a pipe during a robbery).

In his tenth issue, citing to Pa.R.Crim.P. 601(C),[16] Appellant contends the trial court erred in permitting another judge to preside over a portion of Appellant's trial, thus requiring a new trial. We find this issue to be waived.

_____

[15] Appellant does not point to any other evidence in support of his claim that he was entitled to an involuntary manslaughter instruction.

[16] Pa.R.Crim.P. 601(C) provides that "[t]he judge who is present from the time the trial commences shall be considered the trial judge and shall be present, except in extraordinary circumstances, until a verdict is recorded or the jury is discharged."

The record reveals that the Honorable Linda Carpenter presided over Appellant's trial; however, during jury deliberations, Judge Carpenter "became extremely ill," and thus, the Honorable Barbara McDermott presided when the court reconvened to give a supplemental jury instruction[17] and accept the jury's verdict. **See** Trial Court Opinion, filed 12/15/16, at 27. Appellant does not point to any objection that he lodged with regard to Judge McDermott sitting for Judge Carpenter, and our review of the record does not reveal such an objection. Thus, Appellant has waived his claim of error on appeal.[18] **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); **Rivera**, **supra** (holding lack of contemporaneous objection results in waiver).

In his final issue, Appellant presents a legality of sentencing claim. Specifically, Appellant contends that his sentence is illegal since his robbery conviction merges with his second-degree murder conviction for sentencing purposes.

---

[17] The record reveals that Judge McDermott consulted with Judge Carpenter via the telephone with regard to the supplemental jury instruction. N.T., 11/25/13, at 3-16.

[18] Notably, Appellant has developed no appellate argument disputing that Judge Carpenter's illness constituted "extraordinary circumstances" as provided for in Pa.R.Crim.P. 601(C).

"A claim that crimes should have merged for sentencing purposes raises a challenge to the legality of the sentence. Therefore, our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Quintua***, 56 A.3d 399, 400 (Pa.Super. 2013). "A challenge to the legality of the sentence may be raised as a matter of right, is non-waivable, and may be entertained so long as the reviewing court has jurisdiction." ***Commonwealth v. Robinson***, 931 A.2d 15, 19–20 (Pa.Super. 2007) (*en banc*).

Whether offenses merge at sentencing implicates Section 9765 of the Sentencing Code, which provides:

> **§ 9765. Merger of sentences**
>
> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S.A. § 9765. In light of our Supreme Court's decision in ***Commonwealth v. Tarver***, 493 Pa. 320, 426 A.2d 569 (1981), a sentencing court has no authority to impose a sentence for felony murder as well as a sentence for the predicate offense. In other words, a predicate felony and second-degree murder *ipso facto* (1) arise from a single criminal act, and (2) all of the elements of the predicate felony are included within the elements of second-degree murder. ***See Commonwealth v. Adams***, 39 A.3d 310, 325 (Pa.Super. 2012), *affirmed*, 104 A.3d 511 (Pa. 2014).

Here, Appellant contends that his robbery of Mr. McNeil was the predicate felony for his second-degree murder conviction, and thus, the two convictions merged for sentencing purposes. The trial court concluded that Appellant committed two separate robberies (one when he took money from Mr. McNeil's hand during the struggle and one when he took money from Mr. McNeil's wallet after rifling through Mr. McNeil's pockets). *See* Trial Court Opinion, filed 12/15/16, at 29. Thus, the trial court reasoned that, while one of the robberies was a predicate offense for second-degree murder, the other robbery did not arise from a single criminal act such that it did not merge for sentencing purposes. *See id.*

We agree with the trial court that the record supports the conclusion that Appellant's crimes did not arise from a single criminal act. He committed two distinct robberies: one that was the predicate offense for second-degree murder and a second robbery that occurred as Mr. McNeil lay on the ground in a semi-conscious state. In this regard, we note, as stated in an Opinion authored by P.J.E. Bender:

> When considering whether there is a single criminal act or multiple criminal acts, the question is not whether there was a break in the chain of criminal activity. Th[e] issue is whether the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime, [and if so,] then the actor will be guilty of multiple crimes which do not merge for sentencing purposes.

*Commonwealth v. Pettersen*, 49 A.3d 903, 912 (Pa.Super. 2012) (quotations and quotation marks omitted).

In **Pettersen**, the trial court sentenced the appellant to, *inter alia*, consecutive terms of imprisonment on three counts of aggravated assault after he broke into the victim's residence, struck her in the head with a hammer, stabbed her ten times and placed a bag over her head and attempted to suffocate her. *Id.* at 906–07. This Court rejected the appellant's argument that the aggravated assault charges merged for sentencing purposes. Specifically, we held:

> Although the time between the separate acts was relatively short, the three assaults were committed with different weapons and caused distinct injuries to different parts of the victim's body. When [the] [a]ppellant struck the victim in the back of the head with a hammer, he committed an aggravated assault. When [the] [a]ppellant stabbed the victim multiple times in the chest and back, he committed at least one aggravated assault. And [the] [a]ppellant committed an aggravated assault when he attempted to suffocate the victim by placing a plastic bag over her head. [The] [a]ppellant is not entitled to a volume discount for these crimes simply because he managed to accomplish all the acts within a relatively short period of time.

*Id.* at 912.

Similarly, in the case *sub judice*, Appellant committed two separate robberies. Specifically, he committed the first robbery, which was a predicate offense of his second-degree murder conviction, when he grabbed money from the victim's hand while threatening and striking the victim with a crowbar. Further, after the victim fell to the ground and lay in a semi-conscious state, Appellant went through his pockets, removed his wallet, and emptied it of its

contents.  As the trial court notes, the fact that Appellant committed his two robberies within a relatively short period did not require merger.[19]  ***See id***.

For all of the foregoing reasons, we affirm.

Affirmed.

P.J.E. BENDER joins the Opinion.

Judge Bowes files a Concurring Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/8/19

---

[19] Here, the Commonwealth charged Appellant with one count of robbery. However, our Supreme Court has held that "[w]here a murder is alleged to have been committed in the perpetration of a felony, there is no requirement that the defendant actually be charged with the underlying felony." ***Commonwealth v. Giles***, 500 Pa. 413, 456 A.2d 1356, 1359 (1983). Accordingly, the trial court reasoned that the Commonwealth did not charge Appellant with the first robbery, which was the predicate offense for second-degree murder; however, the Commonwealth charged Appellant with the second robbery, which occurred while the victim lay semi-conscious on the ground.