J-A02003-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RYAN SURRATT | : | |
| | : | |
| Appellant | : | No. 331 WDA 2019 |

Appeal from the Judgment of Sentence Entered December 18, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0003462-2018

BEFORE: SHOGAN, J., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SHOGAN, J.: **FILED APRIL 14, 2020**

Appellant, Ryan Surratt, appeals from the judgment of sentence entered

on December 18, 2018, in the Court of Common Pleas of Allegheny County.

We affirm.

The trial court summarized the procedural history of this case as follows:

[Appellant] appeals from the judgment of sentence order
imposed after a bifurcated jury trial, wherein the [c]ourt found
Appellant guilty of one (1) count [each] of Person not to Possess
a Firearm, 18 Pa.C.S.A. §6105(a)(1); Possession of Marijuana, 35
[P.S.] §780-113(a)(31); and Carrying a Loaded Weapon, 18
Pa.C.S.A. 6106(a).

By way of background, this case was originally before the
Honorable Edward J. Borkowski. On April 18, 2017[,] a hearing
occurred before that [c]ourt to address a [sic] Appellant's Motion
to Suppress[,] and on September 13, 2017, Judge Borkowski
entered his Findings of Facts and Conclusions of Law.[1] Sometime
thereafter, the case was assigned to this [c]ourt, and on March
22, 2018, a bifurcated jury trial ended with a mistrial at Count
Two (2) of the information, Firearm not to be Carried without a
License …;18 Pa.C.S. §6106. The [c]ourt did not return a verdict

on the remaining counts. A second bifurcated jury trial occurred on September 20, 2018.[2] Again, the jury was unable to reach a verdict at the VUFA charge[,] and the Commonwealth subsequently *nolle prossed* that charge and case. The [c]ourt then returned guilty verdicts at the three (3) counts referenced above. On December 18, 2018, Appellant was sentenced to five (5) to ten (10) years of incarceration at the charge of Person not to Possess, and no further sentence at the remaining two (2) counts. This [c]ourt denied Appellant's Post-Sentence Motion on January 2, 2019, and a timely Notice of Appeal was filed on February 1, 2019.

> [1] The Findings of Fact were transcribed but not formally filed. On September 14, 2017[,] the [c]ourt summarized these findings on the record[,] and they are reflected in the Pretrial Motions transcript of the same date.

> [2] Count 2 of the original information that was before the jury was docketed at CC 201803780 for housekeeping purposes. Counts 1, 3, and 4 which were simultaneously heard as a bench trial were docketed at CC 201803462.

Trial Court Opinion, 6/5/19, at 2-3. Both Appellant and the trial court

complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

I. Where the only evidence tying [Appellant] to the recovered firearm was his mere proximity and a slight lean forward, did the Commonwealth prove beyond a reasonable doubt that he constructively possessed the firearm?

II. Where the Commonwealth failed to establish that a standard inventory procedure was followed, did the improper inventory search violate [Appellant's] constitutional rights, requiring suppression of the firearm?

Appellant's Brief at 5.

In his first issue, Appellant presents a challenge to the sufficiency of the evidence to support his convictions of person not to possess a firearm and carrying a loaded weapon. Appellant's Brief at 21-37. Specifically, Appellant asserts that the Commonwealth failed to prove that he constructively possessed the gun. *Id*. Appellant contends that he did not have knowledge of the firearm or the intent to possess the firearm necessary to establish constructive possession. *Id*. at 30-37.[1]

Our standard of review is well established:

---

[1] We note Appellant also contends that the trial court erred in improperly considering evidence set forth in his subsequent trial when it rendered its nonjury decision. Appellant's Brief at 25-30. Specifically, Appellant claims that, with regard to his convictions of persons not to possess and carrying a loaded firearm, the trial court was limited to considering only the evidence presented at his nonjury trial held on March 22, 2018. Appellant contends that, in reaching a verdict, the trial court improperly considered evidence from a subsequent jury trial for carrying a firearm without a license, which was held on September 20 and 21, 2018. Initially, we observe that Appellant did not present this claim in his Pa.R.A.P. 1925(b) statement. Hence, it is waived. *See Commonwealth v. Lord*, 719 A.2d 306, 308 (Pa. 1998) (holding that where a trial court directs a defendant to file a concise statement pursuant to Pa.R.A.P. 1925, any issues not raised in that statement shall be waived).

Even if not waived, our review reflects that at the conclusion of the March 22, 2018 trial, defense counsel asked that the trial court "await the resolution" until completion of the trial for carrying a firearm without a license. N.T., 3/22/18, at 195-196. The record further reflects that prior to ultimately rendering the verdict, the trial court indicated that it had already received and considered the evidence from the March 22, 2018, nonjury trial. N.T., 9/20-21/18, at 270-271. Accordingly, we are satisfied that the trial court did not commit any error in rendering its verdict. Furthermore, in conducting our review of Appellant's challenge to the sufficiency of the evidence, we will consider only the evidence presented at Appellant's trial held on March 22, 2018.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder['s]. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Estepp*, 17 A.3d 939, 943-944 (Pa. Super. 2011).

Appellant was convicted of violating the following two provisions of Pennsylvania's Uniform Firearms Act:

**§ 6105. Persons not to possess, use, manufacture, control, sell or transfer firearms**

**(a) Offense defined.**—

(1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

18 Pa.C.S. § 6105(a)(1).

**§ 6106.1. Carrying loaded weapons other than firearms**

**(a) General rule.-** Except as provided in Title 34 (relating to game), no person shall carry a loaded pistol, revolver, shotgun or rifle, other than a firearm as defined in section 6102 (relating to definitions), in any vehicle. The provisions of this section shall not apply to persons excepted from the requirement of a license to carry firearms under section 6106(b)(1), (2), (5) or (6) (relating to firearms not to be carried without a license) nor shall the provisions of this section be construed to permit persons to carry firearms in a vehicle where such conduct is prohibited by section 6106.

18 Pa.C.S. § 6106.1(a).

Possession of a firearm is an essential element of Sections 6105 and 6106.1. However, to establish the element of possession, this Court has explained that "[p]ossession can be found by proving actual possession, constructive possession, or joint constructive possession." ***Commonwealth v. Parrish***, 191 A.3d 31, 36 (Pa. Super. 2018) (citation omitted), appeal denied, 202 A.3d 42 (2019). We previously have determined:

Where a defendant is not in actual possession of the prohibited items, the Commonwealth must establish that the defendant had constructive possession to support the conviction. Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. We have defined constructive possession as conscious dominion, meaning that the defendant has the power to control the contraband and the intent to exercise that control. To aid application, we have held that constructive possession may be established by the totality of the circumstances.

It is well established that, as with any other element of a crime, constructive possession may be proven by circumstantial evidence. In other words, the Commonwealth must establish facts from which the trier of fact can reasonably infer that the defendant exercised dominion and control over the contraband at issue.

***Parrish***, 191 A.3d at 36–37 (internal citations and quotations omitted).

- 5 -

Thus, illegal possession of a firearm may be established by one's constructive possession thereof. *Commonwealth v. McClellan*, 178 A.3d 874, 879 (Pa. Super. 2018). In addition, the power and intent to control contraband does not need to be exclusive to an appellant in order to find constructive possession. Our Supreme Court has recognized that "constructive possession may be found in one or more actors where the item in issue is in an area of joint control and equal access." *Commonwealth v. Johnson*, 26 A.3d 1078, 1094 (Pa. 2011) (citation omitted). Further, contrary to Appellant's suggestion, the Commonwealth was permitted to establish Appellant's constructive possession *via* circumstantial evidence and the reasonable inferences that arise therefrom. *Parrish*, 191 A.3d at 36–37. Moreover, we acknowledge that our Supreme Court has indicated that "[t]he conduct of an accused following a crime, including 'manifestations of mental distress,' is admissible as tending to show guilt." *Commonwealth v. Hughes*, 865 A.2d 761, 792 (Pa. 2004). *See also Commonwealth v. Micking*, 17 A.3d 924, 926 (Pa. Super. 2011) (*en banc*) (an appellant's behavior of extreme nervousness, shaking and trembling exhibited a "consciousness of guilt" regarding firearms offenses).

Our review of the record reflects that Officer Charles Thomas, who had been employed by the Homestead Police Department at the time of this incident, testified that shortly after midnight on November 3, 2016; he stopped the vehicle in which Appellant was traveling as a passenger. N.T.,

3/22/18, at 41-42. Officer Thomas stated that the traffic stop was for speeding and a non-functioning taillight. *Id*. at 42. Officer Thomas provided the following account of the traffic stop:

> Q. The traffic stop is not at issue here, but for context, can you describe to the jury the events of the traffic stop? What happened?
>
> A. For the sake of the traffic stop, I ran the license plate. It came back as Ms. Harris. The stop was conducted just before the Homestead High Level Bridge in the right-hand turning lane. **Upon the activation of my lights and sirens, I did observe [Appellant] lean forward toward the rear passenger side seat which is indicative of having contraband.**
>
> Q. **For clarity, [Appellant] was sitting in the back seat of the vehicle?**
>
> A. **Yes.**
>
> Q. **Could you see him?**
>
> A. **I could. I had spotlights on my vehicle and white take-down lights.** The vehicle windows were tinted and that is automatic when you have tinted windows on the vehicle.
>
> * * *
>
> Q. As you activated those lights, can you tell the jury what you observed?
>
> A. **That is when I observed [Appellant] leaning forward. Just like this. I couldn't see a hand, but I [had[ seen him lean forward, which most people don't do on a traffic stop. I have never seen people that aren't hiding contraband lean forward for no reason. That becomes an officer safety issue, as well, during a traffic stop to see somebody do that.**
>
> * * *

Q. Can you describe for the jury your observation as you approached and started to conduct –

A. When I approached the vehicle, I observed three people in the vehicle. There were some open containers of alcohol in the vehicle. **I observed [Appellant] was very nervous. He appeared to be shaking and shivering. He had to be told several times to keep his hands in plain view for reasons of officer safety.**

N.T., 3/22/18, at 42-44 (emphases added). Officer Thomas went on to explain that, because no one in the vehicle had a valid driver's license, the vehicle was to be towed and an inventory search was performed. *Id*. at 44. Officer Thomas offered the following additional testimony:

Q. Was anything notable found when the vehicle was searched?

A. There was some open containers of alcohol that were found. **[Lieutenant Lewis] Ferguson found a firearm right where I [had] seen [Appellant] leaning forward during the initiation of the traffic stop.**

Q. What you referred to earlier?

A. Yes. Under the front seat or under the back of the front passenger side seat.

> THE COURT: I'm sorry, sir. What was that again[?]

> THE WITNESS: Under the back of the front passenger side seat.

N.T., 3/22/18, at 45 (emphasis added).

The Commonwealth also presented testimony from Lieutenant Lewis Ferguson of the Allegheny County Police Department. N.T., 3/22/18, at 69-80. Lieutenant Ferguson offered the following detailed account of what

transpired as he and his partner immediately arrived at the scene of the traffic

stop as backup support:

> Q. So you arrived on scene very shortly after Officer Thomas or at the same time[.] Can you describe for the jury, your observations, what you saw? In your own words, tell them what happened.
>
> A. So we observed the officer pull over the vehicle. We pulled in directly behind him, called out to radio to let them know we were on the scene with him. Officer Thomas exits his vehicle, approached the driver side of the vehicle. I exited my vehicle and approached the passenger front window. Essentially I can look inside the vehicle to keep the other officers safe and make sure no one is moving around. My partner would have walked behind me and been on the passenger side of the vehicle, but at the back door essentially of the car. And then we would have stood there essentially and backed up Officer Thomas as he was conducting business with the operator of the motor vehicle.
>
> I would call Officer Thomas asking for identification, driver's license from the driver. I couldn't hear what anybody inside the vehicle was saying because I'm outside on the other side. It was my understanding that the driver did not have a driver's license. I believe Officer Thomas asked the other occupants of the vehicle if they had driver's licenses and I believe it was determined that nobody in the vehicle had a valid driver's license.
>
> To my recollection, Officer Thomas decided at that point since there wasn't a valid driver's license that the vehicle was going to be towed per their own departmental policy. I recall Officer Thomas having the driver of the other vehicle, a female, exit the vehicle. I believe a Terry pat-down and cursory search for weapons was conducted by my partner who was a female to make sure there weren't any unsafe weapons or something that would endanger officers on the scene.
>
> Once the driver was checked, I believe she was -- as I remember the driver may have had a warrant and may have been taken into custody, to my recollection. I think the driver did have a warrant to some degree. The front seat passenger, another female, was also removed from the vehicle and searched for weapons. There were none found. I think she was moved off to

the side of the road and essentially waiting for the traffic stop to be finished. The back seat passenger was asked to step out of the vehicle since it was going to be towed. I asked him to step out of the vehicle at Officer Thomas' request. I searched him and a cursory search for weapons, and I didn't find any weapons on him. He was asked to step off to the side.

At that point I turned back toward the vehicle and turned on my flashlight and from outside the vehicle I saw under the back, the front seat of the vehicle underneath the seat I could see the hand grip of a handgun. So I saw it sticking out from under the seat. I turned to one of the other officers and said to put him in handcuffs because I could see right then he had access to a handgun. He was put in handcuffs.

I put on gloves, reached in and removed the handgun from underneath the front passenger seat. The very first thing you do is render the handgun unusable. It had a round inside the magazine. I opened the chamber and removed it from the chamber and gave those items to Officer Thomas.

N.T., 3/22/18, at 74-76.

Lieutenant Ferguson provided the following testimony to expound upon

the location where the firearm was discovered:

Q. Lieutenant, can you describe for the jury in more detail please, the location where the gun was recovered from and the details of the vehicle of the seat, things of that nature?

A. Yes. So the vehicle in question was, to my recollection, a dark-colored Jeep Cherokee, one of those four-door SUV types. The handgun was sitting on the floor of the vehicle pushed under the seat to the degree that from outside of the vehicle, I could see the hand grip of the gun. When I removed it, I noted that there was wiring -- because when I removed it, I looked under there to see if there was anything else I needed to be worried about.

It was one of those seats that instead of being a mechanical seat, it moves by electric. It has this big bundle of wires and stuff down there that kind of separates the front under seat portion from the rear. You can't push things through the seat because there is a bundle of wires and things down there. So it was

- 10 -

essentially under the seat pushed as far forward as that wire bundle would allow it to go and that is where it was sitting. If that answers your question.

Q. It almost gets us there. Would it have been possible for somebody in the front seat to have gotten that firearm to the location where you found it from their position sitting in front of the vehicle?

A. In my opinion, there is no way to do that because this bundle of wires goes from the bottom of the seat all the way to the floorboard. You can't reach all of the way through from the back seat to the floorboard because the electronic system that moves that seat takes up that space. So essentially under the seat you have this bundle of wires and then there is a little portion in the back. So there is no communication between the front and the back.

N.T., 3/22/18, at 78-79.

In addition, the Commonwealth offered testimony from Detective Shannon Hasek of the Allegheny County Police Department regarding observations of Appellant's behavior that she witnessed while serving as a backup officer:

Q. Can you tell the jury what happened in your observations as you approached the vehicle that was stopped by Officer Thomas?

A. I went to the passenger -- the driver side passenger or the back seat passenger side of the vehicle and I was basically observing [Appellant] and he appeared very nervous. He was breathing heavily, sweating, shaking. I had to tell him several times to keep his hands where I could see them. That is really it.

Q. Now at the time that you had made those observations, had anybody been pulled out of the car yet? Do you recall?

A. No.

Q. Had anybody in the car, was there any inclination to suggest that this situation was going to escalate or was this just at that time a traffic stop?

A. It was just a traffic stop. I was a little concerned about [Appellant's] nervousness.

Q. Is that what piqued your interest or what drew your attention?

A. Yes.

Q. In your training and experience, why would that have piqued your interest?

A. Usually when we have a traffic stop where somebody is behaving so nervously, they generally have something in the car they don't want us to know about.

N.T., 3/22/18, at 91-92.

Under the totality of the circumstances, the evidence presented at the trial on March 22, 2018, viewed in the light most favorable to the Commonwealth as the verdict winner, establishes that Appellant constructively possessed the firearm that was found on the floor where Appellant was seated and was the area in which Appellant was seen moving. In addition, the testimony of Lieutenant Ferguson further established that, at the time of the traffic stop, Appellant was the sole occupant of the vehicle having access to the firearm. These two details are indicative of the fact that Appellant exercised dominion and control over the contraband. *Parrish*, 191 A.3d at 36-37. Further, Officer Thomas and Detective Hasek offered testimony regarding Appellant's excessively nervous demeanor during the incident, which is indicative of consciousness of guilt. *Hughes*, 865 A.2d at

792. This circumstantial evidence proves that Appellant had the power to control the contraband and the intent to exercise such control, thereby establishing his constructive possession of the firearm. Accordingly, Appellant's claim that the Commonwealth failed to present sufficient evidence to support his convictions lacks merit.

Appellant next argues that the trial court erred in failing to grant his motion to suppress the firearm. Appellant's Brief at 38-45. Appellant asserts that the Commonwealth failed to meet its burden of proof because it did not offer evidence regarding a policy explaining the scope of a search on an impounded vehicle. *Id*. at 40-42.

It is beyond question that an appellant waives an issue not properly preserved in the lower court. Pa.R.A.P. 302(a). Moreover, an issue raised before the trial court but abandoned at a subsequent hearing is waived for purposes of appeal. *Commonwealth v. Leaner*, 202 A.3d 749, 765 n.3 (Pa. Super. 2019).

Our review of the record reflects that, at the April 18, 2017 suppression hearing, Appellant questioned Officer Thomas extensively on cross-examination regarding the actual Homestead Police Department policy pertaining to inventory searches. N.T., 4/18/17, at 17-20. At the conclusion of the hearing, the following transpired:

THE COURT: Any witnesses, [Defense Counsel?]

[DEFENSE COUNSEL]: Yes, Your Honor. **However, I would like an opportunity to review some case law because of the**

**inventory search. I was not sure. But, I know, Your Honor, there's case law out there that says an inventory must be done by the department policy. When an officer testifies that he can't even specifically say what the policy is, how an inventory search is to be performed, that is a major stumbling block here, Your Honor.**

THE COURT: Major stumbling block for who?

[DEFENSE COUNSEL]: For the Commonwealth.

THE COURT: Legally?

[DEFENSE COUNSEL]: Yes, legally, Your Honor.

THE COURT: All right. **I'll allow you to supplement your motion in this instance if you show that vital report supplement your motion with a written -- amended motion we'll give you the opportunity to the Commonwealth to [respond] in writing or to supplement the record with the actual policy from the Homestead Police Department. All right. Is that your motion?**

[DEFENSE COUNSEL]: That is, Your Honor.

THE COURT: Any objection?

[ASSISTANT DISTRICT ATTORNEY]: No, Your Honor.

THE COURT: All right. Thank you. We'll reschedule the matter at the convenience of the parties for a specific time that's necessary to prepare that.

*Id*. at 33-34 (emphases added).

On September 14, 2017, the parties appeared before the trial court and

the following occurred at the outset of the hearing:

[DEFENSE COUNSEL]: ... I believe we stopped the suppression last time we were in here, and I don't believe there's been any ruling. I think we were just going to have some argument on the suppression issue.

THE COURT: Okay. I thought I heard -- well, we agree except for the fact that my perception is that we didn't stop the hearing, the hearing concluded, and **I left it open that if you wanted to provide additional information, case law, we'll reconvene on the matter and I'll entertain that. But no one has done that.**

[DEFENSE COUNSEL]: **No, Your Honor, since [the Assistant District Attorney] had been handling this matter and he provided me with some of -- the inventory policy from the Homestead police department, and that satisfied me on that.**

The only argument I would have with regard to suppression is regarding the items found on [Appellant]. There was a small amount of marijuana and black gloves found on [Appellant].

THE COURT: Okay.

N.T., 9/14/17, at 2-3 (emphases added). The September 14, 2017 hearing continued with no further discussion pertaining to the inventory search policy, and at the conclusion of the hearing, the trial court offered findings of fact and denied the motion to suppress.

As indicated above, at the September 14, 2017 hearing, Appellant abandoned the argument that the Commonwealth failed to establish that the inventory search was conducted pursuant to police department policy. Hence, we are constrained to conclude that the issue has been waived. *Leaner*, 202 A.3d at 765 n.3. Accordingly, no relief is due.

Judgment of sentence affirmed.

- 15 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/14/2020