J-A06035-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| COURDE DAYE | : | |
| | : | |
| Appellant | : | No. 172 WDA 2023 |

Appeal from the Judgment of Sentence Entered September 7, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0001723-2020

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| COURDE DAYE | : | |
| | : | |
| Appellant | : | No. 173 WDA 2023 |

Appeal from the Judgment of Sentence Entered September 7, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0000492-2022

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| COURDE DAYE | : | |
| | : | |
| Appellant | : | No. 174 WDA 2023 |

Appeal from the Judgment of Sentence Entered September 7, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0000496-2022

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

J-A06035-24

Appeal from the Judgment of Sentence Entered September 7, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0001066-2019

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED: March 21, 2024**

Courde Daye ("Daye") appeals from the judgement of sentence entered by the Allegheny County Court of Common Pleas following his convictions of first-degree murder, aggravated assault, discharging a firearm into an occupied structure, and persons not to possess a firearm.[1]  On appeal, Daye challenges the sufficiency of the evidence with respect to his first-degree murder and persons not to possess a firearm convictions.  Because we find no merit to either of Daye's sufficiency claims, we affirm.

The charges in this case arose from incidents that occurred on November 19 and 20, 2018.  The trial court summarized the factual history of this case as follows:

> On the evening of November 20, 2018, at approximately 8:07 p.m., [Daye] entered [Thomas Cole's ("Cole")] [c]ellphone [s]tore in North Braddock and fired at least eight shots inside, injuring James Dent [("Dent")].  Dent was an 85-year-old man who suffered a gunshot wound to his spine in that barrage of

_____

[1]  18 Pa.C.S. §§ 2502(a), 2702(a)(1), 2707.1(a), 6105(a)(1).

- 2 -

shots, which paralyzed him and ultimately led to his death on May 9, 2019. [N.T., 6/1/2022 – 6/8/2022, at] 70, 83-84, 87-90, 96, 98-99, 103-04, 117-18, 135, 145, 150, 152, 243-44, 414-15, 424).

[Dent] was a longtime friend of [Cole.] [*Id.*] at 164, 190. The men had known each other for 20 years. [*Id.*] [Dent] came to [Cole]'s store every day, and he would assist [Cole] with various tasks, which included taking [Cole]'s son to football and baseball practice. [*Id.*] at 164, 185.

On the day of [Dent]'s shooting, [Cole] was with his girlfriend in the back living room area of the store when he heard multiple gunshots coming from the front of the store, where [Dent] was located. [*Id.*] at 165-66, 186-87. [Cole] initially tried to take cover. When he was finally able to make his way to the front after the gunfire ceased, he saw [Dent] "laying on the ground" on his stomach. [*Id.*] at 167-68, 188-89, 208-09. A witness named Edward May was outside of the store immediately before the shooting, and he recalled hearing someone inside screaming "oh G[-]d please don't" before shots were fired. [*Id.*] at 231-32, 235.

As he laid on the floor awaiting medical transport, [Dent] told [Cole] that he had been shot in his back, and he told [Cole] that "Daee Daee shot me." [*Id.*] at 168-69, 174, 191-92, 209. "Daee Daee" is the nickname by which they both knew [Daye], and [Cole] had personally known [Daye] for nearly a decade. [*Id.*] at 154, 177. [Cole] immediately called 911 and waited with [Dent] while the ambulance arrived, treated and transported him. [*Id.*] at 118, 169. [Cole] followed [Dent] to UPMC Mercy Hospital, where he spoke with homicide detectives. [*Id.*] at 170, 243, 247-48.

At the hospital later that evening, detectives conducted a recorded interview with [Dent], who was in critical condition. [*Id.*] at 243-44, 255, 305. [Dent] was in substantial pain and repeatedly expressed serious concern about whether he was going to survive. [*Id.*] at 243-45, 248. [Dent] told the detectives that he saw the shooter's face and that the shooter had an assault rifle. [*Id.*] at 246-47. For the second time that evening, [Dent] identified the shooter as "Daee Daee." [*Id.*] at 246-47. [Dent] knew [Daye] because they were both regulars in [Cole]'s store and had been there together at the same time on many occasions.

- 3 -

[*Id.*] at 175. The detectives presented [Dent] with a photo array that same evening, and [Dent] positively identified [Daye]'s picture without hesitation as he lay paralyzed in his hospital bed. [*Id.*] at 253-59.

After seeing the detectives at the hospital, [Cole] agreed to speak with them further at the Allegheny County Police Headquarters. [*Id.*] at 170-71, 192, 249. [Cole] gave a recorded interview where he told the detectives about another shooting that had happened at his store just the day before and how [Daye] had shot him. [*Id.*] at 107, 110, 113, 155, 172, 249, 293. [Cole] provided consent for them to access and review the video system that had been taken from his store on the night of his own shooting, though subsequent investigation into that video system did not reveal anything of value [because] the machine malfunctioned. [*Id.*] at 250, 268.

At trial, [Cole] explained that, prior to the shootings, [Daye] would regularly come to his store to "hangout." [*Id.*] at 154, 156-57. [Cole] testified that on November 19, 2018, the day before [Dent]'s shooting, [Cole] "was selling weed" and [Daye] was sitting in his store with him "like any other day." [*Id.*] at. 156, 178. The pair were "talking" and "listening to music" when [Cole] left to use the restroom. Upon returning, [Cole] found himself in the crosshairs of [Daye]'s pistol. [Cole] told him, "come on, man. Put the gun down. We're better than this." [*Id.*] at 158. [Cole] testified that he did not know [Daye]'s motive or why he was pointing a firearm at him. [*Id.*] at 157-58.

[Cole] testified that he "looked around" and then "jumped at [Daye]." [*Id.*] at 158, 182. He tried to disarm [Daye], but, after a brief struggle over the firearm, the gun went off, and [Cole] was shot multiple times in his left leg. [*Id.*] at 158-60, 162. [Daye] left the store immediately after the shots rang out, and [Cole] went to the store next door and asked them to call 911. [*Id.*] at 160-61. [Cole] underwent surgery to remove the bullets from his leg, and he left the hospital that same night. [*Id.*] at 162.

Police responded to the November 19, 2018, shooting incident involving [Cole], but there were "no witnesses or victims on scene" when they arrived. [*Id.*] at 111, 128. After securing a search warrant, officers discovered a large amount of marijuana in the kitchen area of the store, as well as a .9-millimeter shell

casing and blood droplets. [*Id.*] at 111-12, 134. [Cole] did not identify [Daye] as his shooter on the day that he was shot. He testified that he withheld that information because of the "code[,]" which strongly dissuades people from speaking to the police. [*Id.*] at 107, 114, 163, 184, 202-03. However, [Cole] did tell [Dent] that [Daye] had shot him, and [Dent] relayed that information to the detectives while they were recording his statements at the hospital on the night of November 20, 2018. [*Id.*] at 246-47.

If it was not for [Dent]'s shooting, [Cole] "would have never spoken" to the police about the details of his own shooting incident. [*Id.*] at 163. However, after [Dent] told him that [Daye] was responsible for his injuries, [Cole] changed his mind and decided to cooperate with police and identify his shooter "because an 85[-]year-old man got shot in my store, and he was my best friend." [*Id.*] at 172.

\* \* \*

Sadly, after the shooting, [Dent] "showed a continuous decline in health without a significant recovery" from his gunshot wound. [*Id.*] at 87. [Dent] suffered for six (6) months before his paraplegia caused several different infections[, including lung, bladder, and ulcerative infections,] which, in turn, caused the sepsis that ultimately took his life. [*Id.*] at 80, 84, 89-90.

Trial Court Opinion, 5/4/2023, at 4-11 (footnotes omitted; citations modified).

Daye was arrested and charged with numerous offenses arising out of both shootings. On June 8, 2022, a jury found Daye guilty of first-degree murder at docket number 1723-2020, relating to Dent's shooting. The jury also found Daye guilty of aggravated assault and discharge of a firearm into an occupied structure at docket number 2019-1066, relating to Cole's shooting. The trial court held a simultaneous bench trial at docket numbers

2022-0492 and 2022-0496[2] on Daye's persons not to possess a firearm charges and found him guilty on all counts.

On September 7, 2022, the trial court sentenced Daye to life in prison without the possibility of parole for his first-degree murder conviction.[3] Daye filed a timely post-sentence motion, which the trial court denied on January 11, 2023. Daye timely appealed.

Daye presents the following issues for our review:

1. Was the evidence insufficient to prove persons not to possess firearms beyond a reasonable doubt insofar as it was based on incompetent identification testimony by the complainant?

2. Was the evidence insufficient to prove first-degree murder beyond a reasonable doubt because the Commonwealth's evidence that Daye's alleged conduct caused the decedent's paraplegia, which might have caused three medical conditions, one or more of which might have caused sepsis, which caused the decedent's death six months after the fact was so attenuated and uncertain as to require the jury to speculate as to causation?

Daye's Brief at 6.

_____

[2] Daye's persons not to possess firearms charges were severed from the 2019 cases.

[3] Additionally, the trial court sentenced Daye to forty-two to eighty-four-months in prison for his discharge of a firearm into an occupied structure conviction, which the trial court ran concurrently with his sentence for first-degree murder. The trial court also sentenced him to eighteen to thirty-six months in prison for one of his persons not to possess a firearms convictions from which he was immediately paroled based on time served, and another twenty-seven to fifty-six months of incarceration on the other persons not to possess a firearm conviction that was run consecutive to his sentence for first-degree murder.

For his first issue, Daye argues the evidence was insufficient to support his persons not to possess a firearm conviction from November 19, 2018—the date Cole was shot in the leg. Daye's Brief at 22-26. Specifically, Daye asserts that the Commonwealth failed to prove Daye was in possession of a firearm on that date. *Id.* at 24-26. Daye argues that the only evidence that he possessed a firearm was Cole's testimony, which he maintains we should disregard because it is unreliable. *Id.* at 25. In support of his argument that Cole's testimony is unreliable, Daye points to Cole's history as a drug dealer, his failure to tell the police who shot him until after Dent was shot the next day, and the fact that Cole received favorable treatment on federal charges pending against him and immunity in exchange for his testimony against Daye. *Id.*

Although Daye purports to challenge the sufficiency of the evidence of his persons not to possess a firearm conviction, his arguments attacking Cole's credibility conflate the concepts of evidentiary sufficiency and weight. As our Court has repeatedly explained, however, "sufficiency and weight claims are distinct." *Commonwealth v. Rivera*, 238 A.3d 482, 495 (Pa. Super. 2020).

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim the court is required to view the evidence in the light most

favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

*Id.* at 495 (quotation marks and citation omitted),

This Court has explained that a sufficiency of the evidence review does not include an assessment of witness credibility. *Commonwealth v. Juray*, 275 A.3d 1037, 1043 (Pa. Super. 2022). "Instead, such arguments are more properly characterized as challenges to weight of evidence." *Id.* (citations omitted). Additionally, it is well settled that an "appellant's challenge to the sufficiency of the evidence must fail, where an appellant phrases an issue as a challenge to the sufficiency of the evidence, but the argument that the appellant provides goes to the weight of the evidence." *Id.* (quotation marks and citations omitted).

Here, while we acknowledge that Cole's testimony is the only evidence that Daye was in possession of a firearm on the date of Cole's shooting, it is

nonetheless evidence of possession. *See* Trial Court Opinion, 5/4/2023, at 36-37 (finding Cole's testimony to be credible). As this Court has held, "the uncorroborated testimony of a single witness is sufficient to sustain a conviction for a criminal offense[.]" *Commonwealth v. Johnson*, 180 A.3d 474, 481 (Pa. Super. 2018).

Daye's arguments attacking Cole's credibility are more properly construed as a challenge to the weight, not the sufficiency of the evidence. *See id.*; *Rivera*, 238 A.3d at 495. Daye did not preserve a challenge to the weight of the evidence of his persons not to possess a firearm conviction because he did not raise it prior to sentencing or in his post-sentence motion. *See Commonwealth v. Thompson*, 93 A.3d 478, 490 (Pa. Super. 2014) ("A weight of the evidence claim must be preserved either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing."). For this reason, Daye's first issue must fail.

For his second issue, Daye challenges the sufficiency of the evidence to support his first-degree murder conviction. Daye's Brief at 26-39. Specifically, Daye argues that the Commonwealth failed to prove that his shooting of Dent was the ultimate cause of Dent's death and that the chain of causation—from the bullet wound, to paraplegia, to three different infections, to sepsis, and then death—was so attenuated that it required the jury to speculate regarding the true cause of Dent's death. *Id.* Daye notes that the Commonwealth presented evidence that Dent suffered from three different

infections: lung, bladder, and ulcerative. *Id.* at 29-30. Daye contends, however, that lung infections are common among people at Dent's advanced age and, consequently, there was no evidence linking Dent's paraplegia to his lung infection, and therefore his death. *Id.* at 29-30, 33-34. With respect to his bladder and ulcerative infections, Daye argues that the Commonwealth failed to establish that these infections were not preventable, and that Dent therefore could have taken actions that would have prevented his death. *Id.* at 31-35.

Our Court's standard of review of a challenge to the sufficiency of the evidence is well settled:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Juray*, 275 A.3d at 1042 (quotation marks and citations omitted).

Our Supreme Court has set forth the elements of first-degree murder as follows: "(1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill." *Commonwealth v. Martin*, 101 A.3d 706, 718 (Pa. 2014) (citing 18 Pa.C.S. § 2502(a)). "To establish criminal causation, the Commonwealth must prove that the defendant's conduct was so directly and substantially linked to the actual result as to give rise to the imposition of

criminal liability." ***Commonwealth v. Leaner***, 202 A.3d 749, 768 (Pa. Super. 2019) (quotation marks and citation omitted).

Our Court has established a two-part test for determining criminal causation. ***Id.*** First, the defendant's conduct must be a precursor, "but for which the result in question would not have occurred." ***Id.*** Importantly, "[a] victim's death cannot be entirely attributable to other factors; rather, there must exist a causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place." ***Id.*** (quotation marks and citation omitted). With respect to the first part of the test, the defendant's conduct does not need to be the only cause of the victim's death to establish a causal connection. ***Id.*** at 769. An individual is criminally responsible where the "conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result." ***Id.*** (quotation marks and citation omitted).

Second, the consequences of the defendant's actions "cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible." ***Id.*** (quotation marks and citation omitted). This second part of the test is satisfied "when the victim's death is the natural or foreseeable consequence of the defendant's actions." ***Id.*** (quotation marks and citation omitted). "Where the fatal result was an unnatural or obscure consequence of the defendant's actions, justice would prevent us from

allowing the result to have an impact upon a finding of the defendant's guilt." *Id.* (quotation marks and citation omitted).

At Daye's trial, Willis Ashton Ellis, M.D. ("Dr. Ellis"), the medical examiner that performed Dent's autopsy, testified as an expert regarding the cause of Dent's death. N.T., 6/1/2022 – 6/8/2022, at 80-106. Dr. Ellis testified that Dent died of sepsis, "which is a blood infection," and that the source of Dent's sepsis was three underlying infections—lung, bladder, and ulcerative infections—each of which he linked to Dent's paraplegia. *Id.* at 88-89. Dr. Ellis testified that each one of these infections could have caused the sepsis that led to Dent's death. *Id.* at 90.

Regarding Dent's lung infection, Dr. Ellis explained that it is "very common" for paraplegics to get lung infections because they have difficulty coughing, and when a person cannot cough, they "almost always get a lung infection." *Id.* at 90-91. Dr. Ellis stated that it is "well[]documented … that paraplegia leads to pneumonia." *Id.* at 90.

With respect to Dent's bladder infection, Dr. Ellis testified that paraplegics often cannot urinate because their legs do not function properly, and they tend to need catheters to help them urinate. *Id.* at 92-93. Dr. Ellis stated that "[t]hose catheters very frequently cause infection." *Id.* at 93. In this case, Dr. Ellis explained that he found the same class of bacteria in both Dent's bladder and his blood. *Id.*

Regarding Dent's ulcerative infection, Dr. Ellis explained that they are common among paraplegics and occur when a person develops ulcers, typically on their back, which result from the pressure of the persons weight closing off their blood flow because they are unable to move or feel the need to move to open the blood flow. *Id.* at 95–96. Dr. Ellis testified that Dent had seven such ulcers, the largest of which was "[b]igger than a softball, and smaller than cantaloupe." *Id.* at 96. Dr. Ellis testified that Dent's ulcers were so severe that they went "through the skin and the tissue beneath the skin into things like muscle and bone[,]" making the degradation of his bones visible from the outside. *Id.* at 97. Dr. Ellis explained that the exposure of interior bodily tissue or bone to the air often results in infection and that "infections that involve bone are more likely to cause sepsis because it gives bacteria an easy way to get to the blood." *Id.* at 97-98.

Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, there is ample evidence to conclude that Dent's shooting, which caused his paraplegia and subsequent infections, caused his death. Dr. Ellis' testimony provided a direct line from the shooting to the paraplegia to the infections to the sepsis; there is nothing about Dr. Ellis' testimony that would require a jury to speculate about Dent's cause of death. Dr. Ellis testified that each of Dent's lung, bladder, and ulcerative infections were common among individuals who suffered from paraplegia, and each could have caused the sepsis that led to his death. Thus, the evidence was

- 13 -

sufficient to conclude that Daye shooting Dent was a direct and substantial factor in Dent's death. ***See Leaner***, 202 A.3d at 768-69.

Dent's death after he was shot by Daye was not so extraordinarily remote or attenuated that it would be unfair to hold Daye criminally responsible for what Dr. Ellis described as Dent's continuous decline in health without a significant recovery from the gunshot wound. ***See id.*** at 769 (noting that medical intervention keeping the victim alive for 124 days after the assault does not establish that appellant's action was so remote or attenuated that it would be unfair to hold him criminally responsible for the death). Lastly, we find Daye's contention that Dent was somehow responsible for his own death because he failed to properly care for himself after he became paraplegic to be completely meritless; as this Court has long recognized, "contributory negligence of the victim is not a defense in a criminal action." ***Commonwealth v. Long***, 624 A.2d 200, 204 (Pa. Super. 1993).

In light of the foregoing, we conclude that the evidence was sufficient to conclude that Daye caused Dent's death, and therefore, sufficient to sustain his conviction of first-degree murder. Accordingly, Daye's second issue does not entitle him to relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

3/21/2024